114 F.3d 928
 46 Fed. R. Evid. Serv. 1233, 97 Cal. Daily Op.
Serv. 4324,
97 Daily Journal D.A.R. 7233
UNITED STATES of America, Plaintiff-Appellee,
v.
Gil Manuel PAGUIO, Jr., Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Angelica D. ACOSTA, Defendant-Appellant.
 Nos. 95-50370, 95-50375.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 6, 1996.
Decided June 9, 1997.
 
 Michael Tanaka, Deputy Federal Public Defender, Los Angeles, California, for defendant-appellant Paguio, Jr.
 Paul E. Potter, Potter, Cohen & Samulon, Pasadena, California, for defendant-appellant Acosta.
 Steve A. Linick, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.
 Appeals from the United States District Court for the Central District of California, William J. Rea, District Judge, Presiding. D.C. No. CR-94-00931-WJR.
 Before HALL, O'SCANNLAIN and KLEINFELD, Circuit Judges.
 OPINION
 KLEINFELD, Circuit Judge:
 
 
 1
 This case turns on Federal Rule of Evidence 804(b)(3), the hearsay exception for inculpatory statements by unavailable witnesses.
 
 I. Facts
 
 2
 Appellants Gil Manuel Paguio, Jr. and Angelica D. Acosta, husband and wife, were convicted of false statements to a bank to influence action on a loan application, under 18 U.S.C. §§ 2 & 1014. Paguio Jr.'s father, Gil Paguio, Sr., initiated the loan process. The father approached the institution's loan officer about a $204,000 loan so that his son, Paguio Jr., and Acosta, could buy property next to his house. The loan officer gave the father the application, and the father returned the handwritten loan application with what purported to be the son's and the fiancee's signatures.
 
 
 3
 The application was fraudulent. It showed that Paguio Jr. and Acosta made $1,900 and $1,300 a month in self-employment income from the father's insurance company. That was not true. As part of its routine for loan processing, the bank had to verify employment and income by examining W-2 Forms, or for self-employed people, copies of tax returns. As "verification" the father showed the bank fictitious 1988 and 1989 tax returns and 1099 forms for Paguio Jr. and Acosta. None of these forms had actually been filed with the IRS.
 
 
 4
 In truth, Paguio Jr. and Acosta were in no position to finance anything for $200,000 dollars. Acosta had been turned down for an $18,000 car loan. The bank manager had noted on the denial: "excessive obligations for amount requested. Good credit history. Will reconsider in lesser amount...." Paguio Jr. had asked for forbearance on his $10,000 dollar student loan because of inability to make the payments. Nevertheless, both Paguio Jr. and Acosta signed the final loan application.
 
 
 5
 Paguio Jr. worked in the computer room of another bank. He was under investigation by the FBI, because the bank had processed a counterfeit computer tape, which caused a $70 million dollar funds transfer to a Swiss bank. Paguio Jr. was the last person to handle the tape, so the FBI suspected he probably knew something about the computer theft, but he did not provide any useful information. The FBI investigated Paguio Jr.'s financial situation. They discovered the $204,000 loan and other evidence that Paguio Jr. and his fiancee were not as financially secure as the loan application suggested. The United States Attorney ultimately indicted appellants Paguio Jr. and Acosta in order to pressure Paguio Jr. to tell what the government suspected he knew about the computer theft.
 
 
 6
 Paguio Jr. and Acosta went to trial on their indictment. The defense was in substance that the house loan was the father's deal, and the son and fiancee lacked mens rea. The jury hung, but the government got convictions when the case was retried.
 
 II. Analysis
 
 7
 A. Acosta's Vindictive Prosecution claim.
 
 
 8
 Appellant Acosta moved to dismiss the indictment for vindictive prosecution, and appeals denial of her motion.
 
 
 9
 It is a nasty business to indict two people, in order to use the pressure to make one of them talk about an entirely different matter. But it is not what the precedents call "vindictive prosecution." Vindictive prosecution occurs when the government "penalize[s] a person merely because he has exercised a protected statutory or constitutional right." People of Territory of Guam v. Fegurgur, 800 F.2d 1470, 1472 (9th Cir.1986); see also Adamson v. Ricketts, 865 F.2d 1011, 1017 (9th Cir.1988). There is no constitutional right not to "snitch." See United States v. Gardner, 611 F.2d 770, 773 (9th Cir.1980).
 
 
 10
 Acosta showed that she was indicted to pressure her fiancee to talk. We can find no precedent for the proposition that prosecution is "vindictive" when used to pressure a spouse, so long as "the prosecutor has probable cause to believe a defendant committed a crime." See United States v. Duran, 41 F.3d 540, 544 (9th Cir.1994). The government may indict, even if its motive is to get cooperation in another case, United States v. Gardner, 611 F.2d 770, 773 (9th Cir.1980), where the government has probable cause. Here the government had Paguio Jr.'s and Acosta's signatures on a loan application which was plainly and demonstrably fraudulent, seeking to borrow $200,000 which their present circumstances would not enable them to repay. Indicting them for this crime was not vindictive, even though the prosecution had an ulterior motive.B. The Car Loan.
 
 
 11
 Acosta argues that the district court abused its discretion in admitting evidence that she had applied and been turned down for an $18,000 car loan to buy a BMW. The government put on a witness and this document:
 
 
 12
 Excessive obligations for amount requested. Good credit history. Will reconsider in lesser amount. $10,000 and 20% down.
 
 
 13
 Her argument is that the evidence should have been kept out as other bad acts to prove character, under Federal Rule of Evidence 404(b), and even if not, that the danger of unfair prejudice substantially outweighed its probative value under Federal Rule of Evidence 403.
 
 
 14
 The evidence was admissible to show knowledge of the limited extent of her borrowing capacity, under the "knowledge" exception in the second sentence of Rule 404(b). As for unfair prejudice under Rule 403, there may have been none, because being turned down for a car loan did not invite the jury to find against Acosta on an inappropriate ground. There is nothing wrong with trying to borrow $18,000 to buy a car, with getting turned down, or with being approved up to $10,000, so there is no reason why a jury would deny such a loan applicant a fair evaluation of the other evidence.
 
 
 15
 The prosecutor might have been angling for an innuendo that Acosta must be an extravagant person to try to buy a BMW in her financial circumstances, but any such innuendo was weak, because $18,000 is not extravagant for a car. To the extent that any unfair prejudice might lie in the innuendo, the district judge was within his discretion under Rule 403 in deciding that the probative value of the evidence, to show knowledge, was not substantially outweighed by the danger of unfair prejudice.
 
 
 16
 C. The Absent Witness Statement.
 
 
 17
 Paguio Jr.'s lawyer had obtained a statement from Paguio Sr. that his son had "nothing to do with it." When the case was retried, Paguio Sr. was a fugitive, so the defense tried to get the statement into evidence by means of the absent witness hearsay exception for statements against penal interest, Federal Rule of Evidence 804(b)(3). The district court excluded it, and Paguio Jr. and Acosta appeal this evidentiary ruling.
 
 
 18
 Paguio Jr.'s lawyer and paralegal assistant interviewed Paguio Sr. Defense counsel advised Paguio Sr. that she was not his attorney, she represented his son, and what he told her was not privileged. He told her that the whole scheme was his, and his son (and by implication, his son's fiancee) had nothing to do with it.[1] The father had refused to testify about this, claiming his Fifth Amendment privilege at the first trial, and he became a fugitive prior to the retrial. The district court ruled that the portions of the evidence in which the father admitted his own criminal responsibility, but not those exonerating the son, could come into evidence.
 
 
 19
 Certain statements against penal interest have long been admissible as an exception to the hearsay rule, and the common law exception has been codified in the Federal Rules of Evidence:
 
 
 20
 Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
 
 
 21
 ....
 
 
 22
 * * *
 
 
 23
 (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
 
 
 24
 Fed.R.Evid. 804(b) (emphasis added).
 
 
 25
 To get a statement against penal interest into evidence under 804(b)(3), the proponent must show that: (1) the declarant is unavailable as a witness; (2) the statement so far tended to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless he believed it to be true; and (3) corroborating circumstances clearly indicate the trustworthiness of the statement. The government concedes the first requirement, that Paguio Sr. was unavailable.
 
 
 26
 As to the third element, corroboration of trustworthiness, the district court found in favor of appellants. The government challenges this determination. There were factors which cut both ways, and plenty to support the district court decision. The evidence showed that the father initiated the transaction and walked the papers through all the relevant offices. The father's role was so dominant that the escrow officer had some confusion about which Paguio she was dealing with, father or son. She eventually received documentation through the mail confirming that Paguio, Jr. and Acosta were the ultimate buyers, but was suspicious that Paguio Sr. had in fact signed the documents. The loan officer, escrow agent and the tax preparer all testified that their dealings were with the father, not the son. The father had prior business relations with the loan officer and the tax preparer, and the son had none. The father's business generated the false 1099 forms which were used to support the false statement of income. The father distributed the papers to the various parties. And of course the whole point of the transaction was for the father to get his son and the son's prospective wife into the house next door.
 
 
 27
 There is one factor that cuts against the trustworthiness of the father's statement, and that is that the appellant is his son. "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Williamson v. United States, 512 U.S. 594, 599, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994). A motive of love might, however, induce a reasonable father to make a false self-inculpatory statement in order to save his son. The possibility that this noble motive would induce a false statement against penal interest cuts in favor of exclusion. But the district judge reasonably concluded that the loan officer, escrow agent, and accountant all corroborated the proposition that the father and not the son managed the entire transaction, and the circumstances were consistent with that, so the corroboration of trustworthiness requirement was satisfied. While a jury could still conclude that the father was lying to save his son, the corroboration sufficed for admissibility of the evidence. As the district judge correctly decided, it was up to the jury to decide whether the father's statement against penal interest was motivated by truthfulness or a noble motive to lie.
 
 
 28
 The district court ruled that the father's statement should be parsed, and only the self-inculpatory portions admitted. Thus the jury was permitted to hear that the father had falsified the W-2 forms (really 1099s) and provided the information to the accountant. The jury was not permitted to hear that the father said his son had nothing to do with the negotiations, nothing to do with preparation of the false 1099s, and no involvement with preparing the false tax returns.
 
 
 29
 The rule provides for admissibility of hearsay from an absent declarant of a "statement which ... so far tended to subject the declarant to ... criminal liability, ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(b)(3). The word "tending" broadens the phrase, so that the statement need not be a plain confession making the difference between guilty and not guilty. United States v. Slaughter, 891 F.2d 691, 698 (9th Cir.1989); United States v. Satterfield, 572 F.2d 687, 691 (9th Cir.1978).
 
 
 30
 A reasonable person in the father's position would have believed that admitting to preparing false tax returns and engineering an admittedly fraudulent loan application would subject him to criminal liability. The issue arises from the father's statements that his son had "nothing to do with it." The government argues that the statement should be seen merely as exculpatory of the son, not inculpatory of the father. We disagree, and conclude that the father's statement should have been admitted in its entirety, not parsed and admitted only in part.
 
 
 31
 "Whether a statement is in fact against interest must be determined from the circumstances of each case," Williamson, 512 U.S. at 601, 114 S.Ct. at 2436, and "can only be determined by viewing it in context." Id. at 603, 114 S.Ct. at 2436. In context, the father's statement that his son had nothing to do with it was inculpatory of the father as well as exculpatory of the son. The father admitted not only participation but leadership, leading his son and daughter-in-law into the abyss. Because leading others into wrongdoing has always been seen as especially bad, there is a sentencing enhancement for it. U.S.S.G. § 3B1.1(c) (1993). Also, in context, the inculpating and exculpating statements were not practically separable.
 
 
 32
 The government argues that Williamson, 512 U.S. 594, 601, 114 S.Ct. 2431, 2435-36, 129 L.Ed.2d 476 (1994), required the district judge to parse the statement and exclude the non-inculpatory parts. That reading is incorrect. In Williamson, the police caught a man with two suitcases of cocaine in his trunk. He admitted that he was knowingly transporting the cocaine, but said Williamson had furnished it to him. At trial the man caught with the cocaine would not testify, but the government was allowed to introduce his hearsay statement that Williamson had furnished it. The Supreme Court held that admission of the hearsay against Williamson was error, without reaching the constitutional issue arising under the Confrontation Clause, because the statement that Williamson had furnished the cocaine was not inculpatory of the man caught with it. The Court said that the part of the statement blaming Williamson was "actually self-exculpatory," so the "commonsense notion that reasonable people ... tend not to make self-inculpatory statements unless they believe them to be true" had no application to the part of the driver's statement pointing the finger at Williamson. Id. at 599, 114 S.Ct. at 2435.
 
 
 33
 Williamson does not mean that the trial judge must always parse the statement and let in only the inculpatory part. It means that the statement must be examined in context, to see whether as a matter of common sense the portion at issue was against interest and would not have been made by a reasonable person unless he believed it to be true. Sometimes that requires exclusion of part of the statement, sometimes not. A reasonable man caught with a trunk full of cocaine, like the unavailable declarant in Williamson, might well imagine that he could advance his own penal interest by fingering someone else. But Paguio Sr.'s statement that "my son had nothing to do with it" was not an attempt to "shift blame or curry favor." Williamson, 512 U.S. at 603, 114 S.Ct. at 2436.
 
 
 34
 Paguio Sr.'s statement is like Justice Kennedy's hypothetical in his Williamson concurrence, where the unavailable declarant said "I robbed the store alone," and a defendant charged with the robbery is only allowed to put in "I robbed the store," and not "alone." Id. at 617, 114 S.Ct. at 2443. Wigmore, citing Holmes, characterized as "barbarous" exclusion of an unavailable declarant's confession, because exclusion increases the risk of convicting the innocent. 5 Wigmore on Evidence § 1477 at 360 (Chadbourn rev.1974). When the prosecution attempts to take advantage of the rule, as in Williamson, the statement is typically in the form, "I did it, but X is guiltier than I am." As a matter of common sense, that is less likely to be true of X than "I did it alone, not with X." That is because the part of the statement touching on X's participation is an attempt to avoid responsibility or curry favor in the former, but to accept undiluted responsibility in the latter.
 
 
 35
 Prosecution use of an unavailable declarant's accusation of the defendant, as in Williamson, raises different concerns from a defendant's use of an unavailable declarant's confession which exonerates him. Were it not for the fence around the Confrontation Clause provided by the hearsay rule, prosecution use would implicate the accused's right to be "confronted with the witnesses against him." U.S. Const. amend. VI. The Constitution gives the "accused," not the government, the right of confrontation. When the defendant seeks to introduce the evidence, but is unable to procure the attendance of the witness, the relevant Constitutional right is the accused's right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The accused's right to present witnesses in his own defense may be implicated where an absent declarant's testimony is improperly excluded from evidence. See United States v. Slaughter, 891 F.2d at 698. We do not intimate that the exclusion of part of the statement violated appellants' constitutional rights in this case, and we do not need to reach the question. We raise the constitutional asymmetry because it helps explain why application of the rule of evidence is to some extent asymmetrical between defense and prosecution.
 
 
 36
 We conclude that the unavailable witness exception for statements against penal interest, Federal Rule of Evidence 804(b)(3) applied, so the parts of Paguio Sr.'s statement exonerating his son should have been admitted. We cannot characterize the error as harmless, because the hung jury at the first trial persuades us that the case was close and might have turned on this evidence. Though Paguio Sr.'s statement that his son had "nothing to do with it" expressly exonerated only Paguio Jr. and not Acosta, the context makes it clear that if the son had nothing to do with it, then the son's fiancee was even more marginal, so the error was prejudicial as to her too.
 
 
 37
 REVERSED.
 
 
 
 [1]
 Here is defendant's offer of proof, by voir dire of the paralegal assistant outside the presence of the jury:
 By Ms. Karlin:
 Q: Were you present at a meeting with Gil Paguio, Senior earlier this year?
 A: Yes, I was.
 Q: When was that meeting?
 A: I don't recall, about a week, week and a half ago.
 * * *
 Q: Did he tell you who negotiated the loan for the duplex?
 A: Yes, he did.
 Q: Who negotiated the loan?
 A: He says he did, along with Randy Wong.
 Q: Did he tell you if Gil, his son Gil, Junior was involved in the negotiations?
 A: He said that his son had very little to do with the negotiations.
 Q: Did he tell you why he negotiated the loan and why Gil, Junior did not participate much?
 A: He said because his son was not familiar with business negotiations, but he himself was more familiar with the terminology and negotiating.
 * * *
 Q: What did he say about how Randy Wong got involved?
 A: He said that Mr. Wong referred to him.
 Q: Did he tell you whether Gil, Junior had known Randy Wong prior?
 A: He said Gil, Junior did not know Randy Wong prior.
 Q: Did Gil, Junior's father talk about whether Gil, Junior and his wife would have qualified for the loan for the duplex, based on their children's income, what their income actually was?
 A: He said--Mr. Paguio, Senior said that Randy Wong told him that they would not qualify for the loan based on their income.
 Q: Okay.
 What did he tell you was done to get the additional income for the loan?
 A: He said that Randy Wong asked him if he ever gave money to his son, for example, as a gift or any kind of financial support, and Mr. Paguio, Senior said that he did occasionally give them money, and Randy Wong suggested to him that he sort of convert that money into a dollar amount.
 Q: And how would he convert it into a dollar amount?
 A: By claiming--by filling out--by claiming that he paid additional income--or by claiming that he paid income to his son.
 Q: Where would that income be from?
 A: From his business.
 Q: Did Gil, Junior's father say his son was actually an employee of his business?
 A: He specified that his son was not an employee of the business.
 Q: Did Gil, Junior have any involvement at all in creating--did he say that Gil, Junior had any involvement in creating these W-2's for the father's business?
 A: Again he specified that he was the one who was involved with creating the false W-2's. He said his son had nothing to do with that.
 Q: Who did?
 A: He did. Gil Paguio, Senior, and his accountant, that guy Pascual.
 Q: Did Mr. Pascual prepare the tax returns?
 A: Yes, I believe that is what he said.
 Q: And is he Gil, Junior's accountant?
 A: Not to my knowledge. I don't recall him saying that.
 Q: Who did Gil, Junior's father say gave Mr. Pascual the information regarding this employment at GMP Insurance?
 A: He said that he spoke to Mr. Pascual, and that Randy Wong spoke to Mr. Pascual, and that Randy Wong spoke to Mr. Pascual on several occasions.
 Q: Did Gil, Senior say whether his son had any involvement in the matter of preparing the false returns?
 A: Again, he said his son did not.
 * * *
 Q: Now, did Senior also tell you that it was Randy Wong who suggested the creation of the false W-2's?
 A: He did not specify that. He said that he was involved in the creation of the W-2's alone.
 Q: Didn't you say that Mr. Pascual was involved as well?
 A: Yeah, I think what I meant by that was it was his idea. He never said it was Wong's idea, specifically said that.
 Q: But he did tell you that it was Wong's idea to recharacterize gift incomes as work incomes?
 A: That's correct.
 * * *
 Q: Did Senior tell you that it was he who had falsified the tax returns?
 A: Yes.
 He said that he was--that he did. He said that he was the one who prepared the false tax returns.
 What I mean is that he didn't say that he prepared them, but he said that it was his own doing. Those were his words, that is what I remember him saying, that it was his own doing; that he was responsible for the tax returns.