**UNITED STATES of America,**

v.

**Robert N. ANGLETON, Defendant.**

**No. CR. H–02–0040.**

United States District Court,
S.D. Texas,
Houston Division.

June 10, 2003.

See also 221 F.Supp.2d 696.

Michael Wayne Ramsey, Houston, TX, for Robert Nicholas Angleton, defendant.

Edward F Gallagher, Terry Clark, Melissa Annis, U.S. Attorneys Office, Houston, TX, James L Turner, U.S. Attorneys Office, Houston, TX, for U.S.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

Roger Angleton, the brother of defendant Robert Angleton, wrote five notes that were found in his cell after his suicide. The government moves for an order in limine as to these "jail notes." (Docket Entry No. 71). Defendant has responded. The issues that can be addressed pretrial are whether, on the present record, the jail notes are admissible under specific exceptions to the hearsay rule, as dying declarations under Federal Rule of Evidence 804(b)(2); statements against interest under Rule 804(b)(3); excited utterances under Rule 803(2); or under the residual exception of Rule 807. This court has carefully considered the motions and responses; the parties' submissions; the record; and the applicable law. Based on this review, this court concludes that Roger Angleton's jail notes are hearsay and do not fall under these exceptions to the hearsay rule. This court cannot resolve, on the present record, whether and to what extent any part of the jail notes might be admissible under Rule 806. The government's motion in limine to exclude any reference to the jail notes at trial is GRANTED, pending any further ruling obtained outside the presence of the jury.

The reasons for this ruling are set out below.

## I. Background

Roger Angleton committed suicide in his cell in the Harris County jail on February 17, 1998, during the state trial of Robert Angleton. Five handwritten notes were found in Roger Angleton's jail cell.

The first handwritten note is dated January 27, 1998 and is addressed to an attorney, "Dan Cogdale." The note asks for the release of $15,000 in a trust account owned by Roger Angleton to Mark Bennett.

The second note bears the heading "Houston Chronicle." Beneath the heading the note states "To: George Flynn or Michael Ramsey." The note is dated February 1, 1997.[1] It was found in an envelope addressed to Michael Ramsey, counsel for Robert Angleton. In the note, Roger Angleton states that "I shot Doris Angleton to death on April 16, 1997 in an attempt to create an extortion situation based on fear to gain money from my brother which I had felt he owed me. I also attempted to make it look as though he was part of it as further leverage to get my money. Now I know I was wrong and can't live with myself and my pain any longer. The purpose of the letter is to let the truth be known." It is signed "Sincerely, Roger Angleton."

The third handwritten note was addressed to "To Whom It May Concern!!" (Docket Entry No. 81). The note is undated. It was placed in an envelope addressed to Mark Bennett, Roger Angle-

---

1. Doris Angleton was killed on April 16, 1997. Roger Angleton committed suicide on February 16, 1998. The government acknowledges that Roger Angleton likely meant to date the fifth note February 1, 1998, rather than February 1, 1997.

ton's attorney, in care of Vanessa Leggett. In the first paragraph of that note, Roger Angleton states that Vanessa Leggett is empowered to make the final arrangements for his body. In the second paragraph, Roger Angleton states that he killed Doris Angleton as part of an "extortion program" against Robert Angleton "based on fear and the threat of further death." The note states that Roger Angleton is in "constant emotional agony" because he killed Doris Angleton and that he intends to "end [his] life to stop the pain." Roger Angleton states that he formed a plan to frame Robert Angleton but that Robert Angleton is innocent of Doris Angleton's murder. In the third paragraph, Roger Angleton disposes of some of his property. The note concludes by stating that "[l]ife is the providence of God and God only I leave this world with that thought."

A fourth handwritten note is addressed to "Mark." It was placed in an envelope addressed to Mark Bennett, in care of Vanessa Leggett. The note is undated. The note opens by stating that "I am very sorry that things didn't work out so that you could have done something with this case but I must die on you." The note asks "Mark" to "please give attached confession to Judge." The handwriting of the short, three-paragraph note appears to become shakier at the end of the second paragraph and in the last paragraph. Roger Angleton apologizes for the poor handwriting, stating that "painkiller tablets" that he "took to kill pain of razors" were "beginning to affect [him]." The final sentence states, "I killed Doris Angleton on April 16, I feel very bad, my brother is innocent, he didn't know. May God forgive me-give this letter to court." No other note has similarly shaky-looking handwriting.

A fifth handwritten note is four pages long and addressed to Vanessa Leggett, and undated. The note begins by stating: "Well among other things I am sorry I have to die on you, I know we had a lot of areas to cover ...." The note states that there was "little if any justification to have killed [Doris Angleton]. And therefore I must be willing and able to pay in like kind if necessary...." The note asks Leggett to convey messages to "Ronna" and "Jenny." Eight postscripts follow. In the first, Roger Angleton asks Leggett to tell "Jenny" of his death. The second states that "I keep thinking of more 'oh by the way' stuff, maybe I am trying to stall." The seventh postscript states that "[f]or the last 2 days, I [recalled?] my life-step by step-and I have only scratched the surface ...." Roger Angleton's signature appears after the final postscript. After the signature, the note states that "I just took a load of pain killers and Darvons so I past the point of no return." The handwriting is consistent throughout this note and does not appear shaky.

## II. The Hearsay Exceptions

### A. Dying Declarations

Rule 804(b)(2) provides that:

In a prosecution for homicide or in a civil action or proceeding, a statement made by a declarant while believing the that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death.

"The dying declaration exception to the rule against admission [is] based on the belief that persons making such statements are unlikely to lie.'" *Idaho v. Wright*, 497 U.S. 805, 820, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). "The sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of oath." *Id.* (quoting *Mat-*

*tox v. United States,* 146 U.S. 140, 152, 13 S.Ct. 50, 54, 36 L.Ed. 917 (1892)).

Although the dying declaration is a "firmly rooted" exception to the hearsay rule, *Pointer v. Texas,* 380 U.S. 400, 407, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965); *Webb v. Lane,* 922 F.2d 390, 393 (7th Cir. 1991) (citing *Pointer* ), it has long been recognized as among the less reliable forms of hearsay. Advisory Committee's Note to FED. R. EVID. 802 (1974).[2] In addition to the risks of distorted or misunderstood communications that impending death may present, "experience suggests that the desire for revenge or self-exoneration or to protect ones loved ones may continue until the moment of death." 5 Joseph M. McLaughlin, Jack B. Weinstein, and Margaret A. Berger, *Weinstein's Evidence* 804(b)(2) at 804–42.1 to 804–43 (2002).

Dying declarations are admissible only in homicide prosecutions and civil cases. To satisfy the dying declaration exception to the hearsay rule, the statement must be made at a time when the declarant believes death is imminent. "To make out a dying declaration, the declarant must have spoken without hope of recovery and in the shadow of impending death." *Shepard v. United States,* 290 U.S. 96, 99, 54 S.Ct. 22, 23, 78 L.Ed. 196 (1933). "Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be a settled hopeless expectation that death is near at hand, and what is said must be spoken in the hush of its impending presence." *Id.* at 100, 54 S.Ct. at 24. "The state of mind must be exhibited in the evidence, and not left to conjecture. The patient must have spoken with the consciousness of a swift and certain doom." *Id.* Not every statement made under such conditions is admissible. Only statements directly relating to the "cause or circumstances" of the declarant's death are admissible.

A court may look at the facts and circumstances surrounding the out-of-court statement to determine whether the declarant made the statements in the belief that death was imminent. *Webb v. Lane,* 922 F.2d 390, 395 (7th Cir.1991)(citing *United States v. Mobley,* 421 F.2d 345, 347 (5th Cir.1970)). Evidence bearing on the timing issue may include "the nature and extent of the wounds ... inflicted being obviously such that [the declarant] must have felt or known he could not survive." *Id.* (quoting *Mattox,* 146 U.S. at 152, 13 S.Ct. at 54). "The length of time elapsing between the making of the declaration and the death is to be considered, although ... it is the impression of almost immediate dissolution, and not the rapid succession of death, that renders the testimony admissible." *Mattox,* 146 U.S. at 151, 13 S.Ct. at 54. "The evidence must be received with the utmost caution, and, if the circumstances do not satisfactorily disclose that the awful and solemn situation in which he is placed is realized by the dying man because of the hope of recovery, [the declaration] ought to be rejected." *Id.* at 152, 13 S.Ct. at 54.

The statement must also directly relate to the cause or circumstances of the declarant's death in order to be admissible. FED. R. EVID. 804(b)(2); *see, e.g., Sternhagen v. Dow Co.,* 108 F.Supp.2d 1113, 1117 (D.Mont.1999) (individual's statement that he believed his illness was caused by chemicals produced by defendant concerned the cause or circumstances of the illness and death); *United States v. Etheridge,* 424 F.2d 951, 966–67 (6th Cir.1970) (statement of a gunshot victim describing

---

**2.** For a brief history of the rule, *see generally* Bryan A. Liang, *Shortcuts to "Truth": The* *Legal Mythology of Dying Declarations,* 35 Am.Crim. L.Rev. 229, 231–236 (Winter 1998).

assailant and the reason for the shooting held to be a dying declaration); *United States v. Lemonakis,* 485 F.2d 941 (D.C.Cir.1973) (statement in handwritten suicide note exculpating defendant accused of robberies held unrelated to cause or circumstances of death).

The government contends that Roger Angleton's jail notes do not qualify as dying declarations under Rule 804(b)(2), because there is insufficient evidence that they were written when he believed his death was "imminent" and because the notes contain a large amount of material unrelated to the cause or circumstances of his suicide. The government argues that some of the notes were written weeks before Roger Angleton committed suicide and the other, undated notes cannot be shown to have been written in the belief that death was "imminent." The notes cover many topics unrelated to the cause or circumstances of the suicide, including statements about Robert Angleton; about Roger Angleton's relationships with various people; and instructions for funeral arrangements and property disposal and distribution.

Robert Angleton responds that there is evidence to show that the notes were written or presented when Roger Angleton had the intent to commit suicide. Angleton cites the fact that the notes were found together in a plastic envelope on the floor of Roger Angleton's jail cell, protected from damage by the blood from the self-inflicted razor wounds, as evidence that Roger Angleton intended these notes to be his last statements. Robert Angleton contends that whether these statements were made in the belief that death was "imminent" does not depend on when the statements were written, but rather on the fact that Roger Angleton gathered and placed the notes for discovery with his body. Angleton argues that Roger Angleton "made" the statements contained in the notes when he placed them in preparation for suicide.

### 1. The Case Law as to When a Dying Declaration Must be Made

Dying declarations must be made in the belief that death is "imminent." There is little case law examining the proof necessary to show that a writing made sometime prior to suicide is a statement made in the belief that death is "imminent," so as to be admissible as a dying declaration. In *State v. Satterfield,* 193 W.Va. 503, 457 S.E.2d 440 (1995), the court admitted a suicide note under the state dying declaration rule, which mirrored the federal rule. In *Satterfield,* a witness in a murder trial was "aggressively questioned" in a way that implied his participation in the murder. After the court day ended and before proceedings began the following day, the witness committed suicide. The witness left a note proclaiming his innocence and stating that he "just [couldn't] take the pressure of going through a trial." The trial court admitted the suicide note under the dying declaration to the hearsay rule. The court found that there was evidence that the decedent wrote the suicide note believing that his death was imminent because the suicide occurred soon after the note was written and the note explained the suicide. *Id.* at 450.

The dissent argued that suicide notes should not be treated as dying declarations:

> [The declarant] was in complete control of the timing and circumstances of his death. The majority fails to distinguish the difference between [a] suicide note, and a statement made by a person facing inevitable death due to circumstances beyond his control. If ever there is a time to put one's best face forward, it would be in a note that will literally stand for all eternity as one's last testament. A suicide note is the

perfect opportunity to rewrite one's own history in a way calculated to impress one's final audience.

My objection is not intended to imply [the declarant] was lying: rather, the idea that suicide notes should be viewed as admissible evidence under the dying declaration exception to the hearsay rule is misguided.

457 S.E.2d at 456.

The "classic" dying declaration is made by a person near death from fatal wounds or illness, who makes a statement to a third party about who inflicted the wounds or caused the illness. The third party testifies as to the declarant's condition and the circumstances of the statement. If, as here, a suicide is unwitnessed and the declaration is contained in a writing discovered after the suicide, no one can testify as to the making of the declaration. It can be difficult to show when a statement was written or whether it was written in the belief that death was imminent. The Supreme Court's caution in *Mattox* that the circumstances surrounding the dying declaration must be satisfactorily established underscores the need for a sufficient showing that such a note was written when the declarant believed death was imminent.

The aspect of control involved in an intended death clearly diminishes the spontaneity that is a critical part of the dying declaration exception. *See* Christopher B. Mueller & Laird C. Kirkpatrick, 4 FEDERAL EVIDENCE § 495 (2d ed.2002) (hereafter "Mueller & Kirkpatrick"); Glen Weissenberger, *Federal Rules of Evidence 804: Admissible Hearsay from an Unavailable Declarant*, 55 U. CIN. L. REV. 1079, 1110–11 (1987). The lack of spontaneity makes it even more essential that the statement be made in the belief of imminent and certain death. Statements made some time before a suicide have been held inadmissible hearsay and not dying declarations. *See, e.g., Pfeil v. Rogers*, 757 F.2d 850, 861 (7th Cir.1985); *Sternhagen*, 108 F.Supp.2d at 1117–18. The *Lemonakis* court in *dicta* stated that a suicide note dated a week before its author committed suicide was "clearly not made with the belief that death was imminent." 485 F.2d at 957 n. 24. In *Collums v. Union Planters Bank, N.A.*, 832 So.2d 572 (Miss.App. 2002), an oral statement made twelve days before the declarant committed suicide was inadmissible as a dying declaration, in part because there was no showing that the declarant then "ha[d] no hope of recovery."

### 2. The Case Law as to What a Dying Declaration Must Contain

■ Under Rule 804(b)(2), only statements directly related to the cause and circumstances of the declarant's death are admissible. The court may redact portions of a written statement containing inadmissible hearsay while admitting portions of the statement that are admissible.[3]

**3.** In *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir.2000), the court admitted the inculpatory portion of defendant's statement as an admission of a party-opponent under Federal Rule of Evidence 801(d)(2), but excluded non-inculpatory portions of the statement as inadmissible hearsay. The court stated that Federal Rule of Evidence 106, the rule of completeness, would not apply even if the statement had been written, because Rule 106 does not compel admission of otherwise inadmissible hearsay. *Id.* In *United States v. Gallagher*, 57 Fed. Appx. 622, 628 (6th Cir. 2003), the Sixth Circuit upheld the admission of certain post-arrest statements made by defendant, while excluding other statements it described as "self-serving" as inadmissible hearsay. The court stated that the completeness requirement of Federal Rule of Evidence 106 did not require that the "self-serving" statements be admitted for completeness, because Rule 106 cannot make statements admissible that would otherwise be excluded. *See also United States v. Vejar–Urias*, 165 F.3d 337, 339–340 (5th Cir.1999) (redaction of portion of confession implicating codefendant and replacing codefendant's name with neu-

In *Lemonakis,* 485 F.2d at 957 n. 24, the court in *dicta* stated that a suicide note written by a third party exonerating the defendant was inadmissible because it did not concern the causes or circumstances of the declarant's death. The case of *United States v. Layton,* 549 F.Supp. 903 (N.D.Ca. 1982) involved a tape recording by Jim Jones, founder of Jonestown in Guyana, made shortly before his followers committed mass suicide. Jones made the tape after receiving word that a party sent from Jonestown had killed a visiting congressman. Jones stated on the tape that "I don't know who killed the congressman. But as far as I'm concerned, I killed him." The court held that this statement did not concern the cause of his impending suicide and refused to admit the statement as a dying declaration. *Id.* at 918.

### 3. The Jail Notes

#### i. The January 27, 1998 Note

■ One of the jail notes is dated January 27, 1998. It does not address the cause or circumstances of Roger Angleton's death. It is inadmissible because it fails to meet either the timing or content requirement of a dying declaration.

#### ii. The February 1, 1998 Note

One note is dated February 1, 199[8], sixteen days before Roger Angleton committed suicide. It is headed "Houston Chronicle" and contains a direct statement that Roger Angleton shot Doris Angleton "in an attempt to create an extortion situation based on fear to gain money from my brother I had felt he owed me. . . . Now I know that I was wrong and can't live with myself and my pain any longer. The purpose of this letter is to let the truth be known."

■ The statement that "I shot Doris Angleton on April 16, 1997" and "[n]ow I know I was wrong and can't live with myself and my pain any longer" relate to the cause of Roger Angleton's death. This is the only statement in this note potentially admissible as a dying declaration. By contrast, Roger Angleton's explanation of why he committed the murder of Doris Angleton—that it was part of a plot to extort money from Robert Angleton—does not speak to the reason for the suicide. It could not be admitted as a dying declaration.

■ The February 1, 1998 note was written weeks before Roger Angleton took his life. Defendant argues that because Roger Angleton positioned it in his cell to be discovered after his suicide, that date, rather than the date on which the note was written, is the date of the declaration. There is no authority for this proposition. Accepting as a dying declaration a note written two weeks before death and left to be discovered after death further attenuates the connection between the consciousness of imminent death and the specific words that are said or written. Neither the language of the rule, nor the case law, supports such an attenuation. No part of this note is admissible under Rule 804(b)(2).

#### iii. The "To Whom It May Concern" Note

One undated note is written to "To Whom it May Concern." It has a sentence of explanation for the suicide: "I killed Doris Angleton ... I realize that I was wrong to take a life of especially an innocent & good person. I am in constant emotional agony and so decided to end my

tral pronouns avoids hearsay problems under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968)); *Manocchio v. Moran,* 919 F.2d 770, 782 (1st Cir.1990)

(statements in police reports or medical records that are inadmissible hearsay should be redacted from materials on defendant's objection).

life to stop the pain." This is the only statement in this note potentially admissible as a dying declaration. Much of this note deals with an explanation for the murder of Doris Angleton and statements about Robert Angleton's lack of involvement in that murder. Such statements do not directly relate to the cause or circumstances of Roger Angleton's suicide and could not be admitted under this rule.

■ This note begins with the words "In the event of my death" and gives instructions to call Vanessa Leggett. The words "In the event of my death" do not suggest or convey imminent death. There is no evidence to suggest that this note was written in the belief that death was swift and certain. No part of this note is admissible under Rule 804(b)(2).

### iv. The Note to Vanessa Leggett

In the lengthy undated note to Vanessa Leggett, most of what Roger Angleton writes is unrelated to the cause or circumstances of his death. He discusses his relationship with Leggett. He writes several postscripts asking Leggett to inform family and friends of his death and to make funeral arrangements. The only statements relating to the reason for suicide are before the postscripts, as follows:

> I had still a lot of life in me with the best to come, but so did Doris. She was an innocent, I wasn't fighting her for my life, family, wealth etc., she wasn't any sort of adversary, so there is little if any justification to have killed her. And therefore I must be willing & able to pay in like kind if necessary & if became necessary, although I cry I have no right.

No other portion of this note addresses the cause or circumstances of Roger Angleton's death.

The eight postscripts conclude with the statement that "I just took a load of painkillers and Darvons so I past the point of no return." The handwriting throughout the note is consistent and not shaky.

■ The note states that "for the last 2 days, I have [recalled] my life-step by step-and I have only just scratched the surface ...." The note also states that Roger Angleton kept thinking of things to write because "maybe I am trying to stall." These comments and the eight postscripts suggest strongly that this note may have been written over a period of time rather than in the moments before Roger Angleton committed suicide. The statement that Roger Angleton was "stalling" suggests a lack of belief in imminent death and that parts of the note were written well before the suicide. There is nothing to show that the statement about the suicide was written when death was believed to be imminent. These delays suggest the absence of a "settled hopeless expectation that death [was] near at hand." Even if Roger Angleton believed that his despair would lead to his death, belief that a condition will eventually end in death is not sufficient to make statements dying declarations. *Shepard*, 290 U.S. at 100, 54 S.Ct. at 24. No part of this note is admissible under Rule 804(b)(2).

### v. The Note to "Mark"

In the note addressed to "Mark," Roger Angleton asks Bennett to "please give attached confession to Judge."[4] The note states:

> I killed Doris Angleton on April 16, I feel very bad, my brother is innocent, he didn't know.

The note then asks "Mark" to "give this letter to court."

---

**4.** There is no evidence that there were any attachments to this note.

■ The statement in this note exculpating Robert Angleton cannot qualify as a dying declaration. As in *Lemonakis* and *Layton*, Roger Angleton's statements that Robert Angleton was not involved in Doris Angleton's murder do not relate to the cause of Roger Angleton's suicide. The only statement in this note that is potentially admissible as a dying declaration is Roger Angleton's statement that "I killed Doris Angleton, I feel very bad." This statement, however, does not directly attribute Roger Angleton's suicide to guilt about Doris Angleton's murder. A statement about past events, rather than about the cause or circumstances of death, is not a dying declaration, unless those events explain the predicament that brought the declarant to death's door. *See Lemonakis*, 485 F.2d at 957 n. 24 (suicide note in which author stated that he had previously lied to prosecutors about defendant's role in a crime inadmissible under Rule 804(b)(2) in part because it did not speak to the cause or circumstances of the suicide); Mueller & Kirkpatrick, § 495 (citing *Etheridge*, 424 F.2d at 966–67 (admitting dying declaration by victim naming assailant and saying that he was shot for knowing too much about bank robbery)).

The undated note to "Mark" states that Roger Angleton had taken painkillers to ease the pain of the razors he would use to inflict fatal wounds on himself and that this was affecting his handwriting. The handwriting in that note becomes shakier in the final paragraph. There is no indication in the record as to when Roger Angleton took painkillers or when he inflicted the wounds that caused his death. Although this is the closest case, there is an inadequate basis to conclude that when Roger Angleton wrote the relevant part of the note to "Mark," he believed his death was imminent. The fact that the handwriting in the much longer note to Vanessa Leggett appears the same throughout strongly suggests that Roger Angleton wrote that note before taking any painkillers or inflicting any wounds.

These doubts undermine the inherent "indicia of reliability" that a dying declaration is normally presumed to have as a firmly rooted exception to the hearsay rule. "[T]he evidence must be received with the utmost caution, and if the circumstances do not satisfactorily disclose that the awful and solemn situation in which he is placed is realized by the dying man because of the hope of recovery, it ought to be rejected." *Mattox*, 146 U.S. at 152, 13 S.Ct. at 54.

*Satterfield* is distinguishable from the facts of this case. The *Satterfield* court stated with confidence that the decedent killed himself soon after writing his suicide note. The statements in the suicide note in *Satterfield* responded to accusations made against the decedent less than twenty-four hours before the decedent's suicide. This court cannot confidently say, based on the facts presented, that Roger Angleton committed suicide soon after writing the relevant parts, of the undated notes. There are no events like the cross-examination the day before the suicide in *Satterfield* that would lead to the conclusion that Roger Angleton wrote the jail notes very shortly before suicide. The state of mind of the declarant "must be exhibited in the evidence, and not left to conjecture." *Shepard*, 290 U.S. at 100, 54 S.Ct. at 24. This court's need to resort to conjecture to determine whether any part of the notes are dying declarations leads this court to find them inadmissible under Rule 104(b)(2).

A declarant need not expressly state that he or she believes that death is imminent. The court may infer the declarant's sense of impending death from "the nature and extent of the wounds inflicted." *United States v. Peppers*, 302 F.3d 120, 137 (3d Cir.2002) (citing *Mattox*, 146 U.S. at 152,

13 S.Ct. at 54); *Mobley,* 421 F.2d at 347. "It is clearly not only permissible, but indeed necessary, . . . that the trial judge draw and rely on inferences from the facts of the record, including the types of wounds inflicted and the nature of the decedent's injuries." In most dying declaration cases, the dying declaration is made after the wounds have been inflicted, so that a court may infer that a decedent believed death was imminent even if the decedent does not state that fact. *See, e.g., Mattox,* 146 U.S. 140, 13 S.Ct. 50. In this case, the record does not show when Roger Angleton wrote the notes in relation to when he inflicted the wounds on himself. It is evident that some of the jail notes were written weeks before the suicide and most of the notes do not directly concern the cause or circumstances of the suicide. The jail notes do not qualify as dying declarations under Rule 804(b)(2).

## B. Statement Against Interest

Defendant contends that the jail notes are admissible under Federal Rule of Evidence 804(b)(3) as statements against Roger Angleton's penal interest. To be admissible under Federal Rule of Evidence 804(b)(3), the declarant must be unavailable, the statement must so far tend to subject the declarant to criminal liability that a reasonable person in the declarant's position would not have made the statement unless believing it to be true, and the

statement, if offered to exculpate the accused, must be corroborated by circumstances clearly indicating its trustworthiness.[5]

In arguing that the jail notes qualify as dying declarations, defendant contends that the notes were written just before Roger Angleton's suicide. If that was true, then the statements would not, as a practical matter, subject Roger Angleton to criminal liability. Defendant's argument that the jail notes were written in the belief of imminent death is inconsistent with the argument that the notes are against penal interest. *See Lemonakis,* 485 F.2d at 957 n. 24 (in rejecting a suicide note's admissibility under Rule 804(b)(4), the court stated that the penal interest "is an interest of no moment to a dead man," and that "we cannot believe that [defendant's] interest against exposure to hatred, ridicule or disgrace, even if translated to his surviving family, is sufficient to meet the intent of that exception in Rule 804(b)(4)."); *United States v. Crowder,* 848 F.Supp. 780, 781–82 (M.D.Tenn.1994) (statements made by terminally ill patient not statements against interest where defendant knew he would likely not live long enough to suffer criminal or civil consequences from his statements). The fact that this court has found that the notes are inadmissible under Rule 804(b)(2) because they did not meet both the timing and

---

**5.** The government contends that the statements in the notes pertaining to Doris Angleton's murder are not admissible under Federal Rule of Evidence 803(3). Defendant does not dispute this assertion. Under Rule 803(3), statements about the declarant's then existing state of mind, such as emotion, sensation, or physical condition, are not excluded by the hearsay rule. Statements of memory or belief to prove the fact remembered or believed are not admissible under Rule 803(3). The statements in the jail notes about the murder of Doris Angleton and the scheme to extort money from Robert Angleton refer to past acts and are not admissible under Rule 803(3). In addition, the statements of reasons for the suicide are inadmissible under Rule 803(3). *See United States v. Liu,* 960 F.2d 449, 452 (5th Cir.1992) (individual's statements that he was scared admissible under Rule 803(3), but statements that he feared a corrupt government agent would hurt him inadmissible) *United States v. Cohen,* 631 F.2d 1223, 1225 (5th Cir.1980) (individual's statements that he was scared admissible under Rule 803(3), but statements as to why he was scared inadmissible).

content requirements of that rule does not necessarily mean that the notes meet all the requirements of Rule 804(b)(3).

▮▮▮ Rule 804(b)(3) requires corroboration. *See United States v. Dean,* 59 F.3d 1479, 1494 (5th Cir.1995) (rejecting statement of defendant under Rule 804(b)(3) as not being trustworthy when defendant had made several questionable statements during plea negotiations). There are no circumstances clearly indicating trustworthiness disclosed in the present record. As the *Satterfield* dissent noted, suicide notes are an "opportunity to rewrite one's own history in a way calculated to impress one's final audience." 457 S.E.2d at 456. "The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." *Williamson v. United States,* 512 U.S. 594, 603–04, 114 S.Ct. 2431, 2437, 129 L.Ed.2d 476 (1994).

As to the exculpatory statements about Robert Angleton contained in the notes, "a clear distinction must be drawn between statements against penal interest that are offered to exculpate a criminal defendant, as against those that are offered to inculpate him." *Dean,* 59 F.3d at 1493 (5th Cir.1995) (quoting *United States v. Sarmiento–Perez,* 633 F.2d 1092, 1100 (5th Cir. Unit A 1981)). Defendant has offered no evidence to corroborate the exculpatory statements in the notes that clearly indicates the trustworthiness of the statements. *Id.* (upholding trial court's ruling that alleged coconspirator's statement exculpating defendants was inadmissible because the statement was not sufficiently corroborated and alleged coconspirator had previously made false statements).

In *United States v. Paguio,* 114 F.3d 928 (9th Cir.1997), the Ninth Circuit found that a father's statement that his son was not involved in a crime was admissible despite the fact that the trustworthiness of the statement was undercut by the possibility that the father was protecting his son. *Paguio* is distinguishable from this case. The *Paguio* court found numerous facts and witnesses showing that the father had a "dominant" role in the alleged crime, which the court held gave the statements the necessary trustworthiness. As with the defendants in *Dean,* but unlike the father in *Paguio,* there are no factors that support the trustworthiness of the exculpatory statements in the jail notes, as necessary under Rule 804(b)(3).

## C. Excited Utterance

▮▮▮ Defendant contends that Roger Angleton's jail notes are admissible as excited utterances under Federal Rule of Evidence 803(2). Under Rule 803(2), an excited utterance is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." For a statement to be admissible under Rule 803(2), there must have been a startling event or occurrence rendering normal reflective thought processes inoperative; the statement must have been a spontaneous reaction to the event or occurrence and not the result of reflective thought; and the statement must relate to the startling condition. *People of Guam v. Cepeda,* 69 F.3d 369, 372 (9th Cir.1995); *United States v. Sowa,* 34 F.3d 447, (7th Cir.1994). The Rule 803(2) Advisory Committee Notes state that "spontaneity is the key factor."

The jail notes fail to qualify as excited utterances. There is no evidence that they were written spontaneously in response to a startling event. The notes were appar-

ently written in jail after much time to reflect and are inadmissible under Rule 803(2).

## D. The Residual Exception to the Hearsay Rule

 Hearsay statements not covered by Rule 803 or Rule 804 may still be admissible under Federal Rule of Evidence 807, the residual exception to the hearsay rule.[6] Rule 807 states:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

"The residual exceptions authorize the admission of hearsay statements having 'circumstantial guarantees of trustworthiness' equivalent to those of the other enumerated hearsay exceptions, as long as the trial court determines that the statements are sufficiently material, probative, and in the interests of justice." *United States v. Ismoila*, 100 F.3d 380, 393 (5th Cir.1997).

The particular guarantees of trustworthiness must be drawn from the totality of the circumstances surrounding the making of the statement, but cannot stem from other corroborating evidence. *Id.* (citing *Idaho v. Wright*, 497 U.S. 805, 820–22, 110 S.Ct. 3139, 3149–50, 111 L.Ed.2d 638 (1990)). "Evidence possessing 'particularized guarantees of trustworthiness' must be at least as reliable as evidence admitted under a firmly rooted hearsay exception ... [and] must similarly be so trustworthy that adversarial testing would add little to its reliability." *Wright*, 497 U.S. at 821, 110 S.Ct. at 3149. "Thus, unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." *Id.* at 821, 110 S.Ct. at 3150.

 The circumstances under in which the jail notes were written do not sufficiently guarantee trustworthiness to overcome the presumption that the notes are inadmissible hearsay. The notes are not admissible under Rule 807.

## III. Conclusion

Roger Angleton's jail notes are inadmissible hearsay. They do not qualify as dying declarations admissible under Rule 804(b)(2), statements against interest under Rule 804(b)(3), or excited utterances under Rule 803(2). The notes are not admissible under the residual hearsay exception of Rule 807. The government's motion in limine to exclude any reference to Roger Angleton's jail notes is GRANT-

---

**6.** Rule 807 combined the hearsay exceptions formerly contained in Rule 803(24) and Rule 804(b)(5).