948 So.2d 84 (2006)
Thomas GARZA, Sr., Sandra Garza, and Thomas Garza, Jr.
v.
DELTA TAU DELTA FRATERNITY NATIONAL, Delta Tau Delta Fraternity Local, Southeastern Louisiana University, Hammond City Police Department, Officer Edwin Bergeron, Paul Upshaw, and ABC Insurance Company.[1]
Nos. 2005-CC-1508, 2005-CC-1527.
Supreme Court of Louisiana.
July 10, 2006.
*86 Charles C. Fonti, Jr., Attorney General, Karen L. Godwin, Assistant Attorney General, for applicant in No. 20005-CC-1508.
Roedel, Parsons, Koch, Blache, Balhoff & McCollister, Carlton Jones, III, Judith R.E. Atkinson, Thomas E. Balhoff, Baton Rouge; Rosas Law Firm, Gregg A. Rozas, George F. Kelly, III, Christopher M. Moody, Hammond, for respondent in No. 205-CC-1508.
Roedel, Parsons, Koch, Blache, Balhoff & McCollister, Carlton Jones, III, Judith R.E. Atkinson, Thomas E. Balhoff, Baton Rouge, for applicant in No. 2005-CC-1527.
Charles C. Foti, Jr., Attorney General, Karen L. Godwin, Assistant Attorney General; Rozas Law Firm, Gregg A. Rozas, George F. Kelly, III, Christopher M. Moody, Hammond, for respondent in No. 2005-CC-1527.
WEIMER, Justice.
Certiorari was granted[2] in this matter to determine whether the lower courts erred in ruling on motions in limine that a suicide note would be admissible at trial as an exception to the hearsay rule. In light of the facts of this case and for the reasons assigned, we hold that the suicide note in question does not qualify as a "[s]tatement under belief of impending death" pursuant to LSA-C.E. art. 804(B)(2), or, as plaintiffs argue alternatively, as an exception to the hearsay rule pursuant to LSA-C.E. art. 803(3) for the purpose of proving the "[t]hen existing mental, emotional, or physical condition" of the decedent.[3]
*87 Accordingly, we reverse the holdings of the lower courts finding the suicide note admissible into evidence as a statement under belief of impending death, we vacate the judgment on the motions in limine, and remand this matter to the district court.

FACTS AND PROCEDURAL BACKGROUND
This matter arises from a tragic death by suicide. Thomas Garza, Sr., and Sandra Garza, along with their son, Thomas Garza, Jr., the parents and brother of the decedent, filed suit against various defendants for the wrongful death[4] of Courtney Garza, on April 9, 2001. On that date, Courtney, a 21-year-old college student at Southeastern Louisiana University (SLU) in Hammond, Louisiana, took her own life by hanging at her parents' home in Baton Rouge. Prior to the suicide, Courtney authored a handwritten letter.
In their original petition, plaintiffs sued Delta Tau Delta International Fraternity, Epsilon Phi Chapter (DTD Local); Delta Tau Delta, National (DTD National), the fraternal organization headquartered in Carmel, Indiana; Paul Upshaw; and the State of Louisiana, through the Board of Supervisors for the University of Louisiana System and Southeastern Louisiana University.[5] Petitioners aver that Courtney's death was "proximately caused by the concomitant negligence of the defendants," which they particularize as: sexual assault and rape of the decedent; continuous and ongoing harassment of the decedent; failure to properly supervise activities of fraternal organizations on the SLU campus; and failure to prevent the tortious activities described in the petition.
The defendants answered the petition, denying the allegations.
Motions in limine were filed by Upshaw, DTD Local, DTD National, and SLU challenging the plaintiffs' right to admit into evidence a suicide note left by Courtney some time before her death by hanging. The note is handwritten on letter-sized, lined paperthree pages, front and back, plus seven lines. It can be broken down into three parts. 1) At the beginning of the note Courtney states she had been thinking about suicide for months, having been constantly depressed; she also talks about seeking counseling and deciding not to seek further counseling. 2) Then, Courtney writes, "I guess I'll begin & explain what happened to me this semester." She relates her account of drinking at a local lounge until closing time, 2:00 a.m. *88 According to the note, she and a sorority sister accepted a ride with a DTD member, and they willingly went to an off-campus house occupied by several fraternity members, where Courtney ended up in the bedroom of Paul Upshaw. She writes, "I was raped." This portion of the note ends with "[a]ll I wanted was to forget about what happened & all it brought me was debt." 3) The final portion of the note consists of goodbyes to family, instructions for getting in touch with friends, and instructions for her funeral.
In a judgment signed on June 15, 2004, the motions were denied in part as to the suicide note up to and including the word "debt" on page three. Thus, the portion of the note preceding the word "debt" was deemed admissible hearsay pursuant to La. C.E. art. 804(B)(2). The motions in limine were granted as to the remainder of the suicide note and pursuant to La. C.E. art. 403[6] deemed inadmissible. Although the parties argued admissibility of the note pursuant to La. C.E. art. 803(3), this article was not addressed by the trial court.
DTD Local and DTD National filed an application for writ to the Court of Appeal, First Circuit; SLU filed a separate writ application. By a two-to-one decision, the court of appeal denied the writs. See Garza v. Delta Tau Delta Fraternity National, 04-1484 (La.App. 1 Cir. 5/6/05), 916 So.2d 185.[7] The majority considered the dying declaration exception to the hearsay rule found in La. C.E. art. 804(B)(2). Rejecting the defendants' reliance on the fact that there was no evidence that Courtney was injured at the time the note was written, the majority found Article 804(B)(2) provided no requirement that there be a wound or injury inflicted prior to the making of a dying declaration. According to the opinion, there was nothing in that statutory provision to prohibit a suicide note from being admitted as a dying declaration. The court found Courtney's written words expressly indicated an awareness of her impending death. The opinion finds the "greatest evidence" that the statement was written with a belief that death was imminent was the fact that Courtney took her own life soon after writing the note. The note was dated April 8, 2001, at 12:30, and Courtney died April 9, 2001.[8]
As to the requirement that a dying declaration relate to the cause or circumstances of the declarant's death, the majority found the handwritten note "offers insight into the circumstances leading to the suicide that shortly followed." Garza, 04-1484 at 6-7, 916 So.2d at 189. The court of appeal indicated that in the note Courtney wrote that she would "explain what happened to me this semester. . . . I hope you can read this. It explains it all for *89 you."[9]Id., 04-1484 at 7, 916 So.2d at 189.
In his dissent, Judge McDonald noted that the "`classic' dying declaration is made by a person near death from fatal wounds or illness, who makes a statement to a third party about who inflicted the wounds or caused the illness." Id., 04-1484 at 1, 916 So.2d at 190. He noted that "such a statement is spontaneously made by one who is unexpectedly facing imminent, certain death. In contrast, a suicide note is a deliberate communication composed in advance of the act itself. The writer intends for the note to be found and read. Therefore, the writer may carefully and methodically select the words used." Id. Specifically, the "author has the opportunity [to] tell some things and omit others, to accuse or exonerate, to clarify or confound, or even [to] seek revenge against someone who is blameless." Id. Judge McDonald concluded the suicide note in this case is not admissible as a dying declaration.
The sole issue presented for our determination is whether the suicide note in question is admissible in evidence as an exception to the hearsay rule as codified in the Louisiana Code of Evidence enacted in 1988.

DISCUSSION
The task of determining the intent of the legislature begins with the words of the applicable statute or statutes, as words are the means used by the legislature to express its intent. State v. Mayeux, 01-3195, p. 4 (La.6/21/02), 820 So.2d 526, 529. However, the exceptions to the hearsay rule provided in the Louisiana Code of Evidence are, to a large extent, a systematization and codification of hearsay exceptions previously recognized in Louisiana. GEORGE W. PUGH ET AL., HANDBOOK ON LOUISIANA EVIDENCE LAW 2006 (hereafter "HANDBOOK 2006"), La. C.E. art. 804(B), 2006 Authors' Notes (2) at 606. Although we are confined by the statutory language, interpretation of the articles of the Code of Evidence would be superficial if performed in a vacuum rather than in the context of history and jurisprudence where the words are susceptible to different meanings. The 2006 Authors' Notes (4) to La. C.E. art. 804(B)(2) at 612 specifically refer the reader to "a collection and analysis of prior Louisiana cases dealing with dying declarations" contained in Timothy J. McNamara, Comment, Dying Declarations in Louisiana Law, 22 La.L.Rev. 651 (1962).
Further, Chapter 8 of the Code of Evidence is entitled "Hearsay" and consists of Articles 801 through 806, which are modeled on Federal Rules of Evidence with the same numbers, (HANDBOOK 2006 at 533), adding common law history and federal jurisprudence to the instructive arsenal available for our use in interpretation of the Louisiana Code of Evidence.[10]See Independent Fire Insurance Company v. Sunbeam Corporation, 99-2181, p. 14 (La.2/29/00), 755 So.2d 226, 234, quoting State v. Foret, 628 So.2d 1116 (La.1993) (It is appropriate for Louisiana courts to utilize the federal authorities in interpreting the Louisiana Code of Evidence.).
Dying declaration:
According to the "Introductory Note" included within the Louisiana Evidence Code enacted by 1988 La. Acts, No. 515, the scope of the state provisions is narrower than that of their federal counterparts. *90 Nevertheless, both federal and state rules broaden the class of admissible out-of-court statements.[11] HANDBOOK 2006 at 533. The main difference between the federal law and Louisiana law is that dying declarations are not admissible in federal prosecutions that do not involve a homicide. Under Louisiana law, dying declarations are admissible in all criminal and civil cases. Nevertheless, this difference does not indicate any lesser evidentiary threshold for admission of a dying declaration than under the federal rules. The Code of Evidence cautions against judicial creation of exceptions to the hearsay rule. See La. C.E. art. 802 ("Hearsay is not admissible except as otherwise provided by this Code or other legislation.").
Despite the modern trend for broadening admissibility, the defendants in the instant case argue that the decisions of the lower courts ignore nearly 200 years of jurisprudence which clearly outlines the very limited scope of the dying declaration exception. According to defendants, the lower courts' interpretation grants sworn status to a "contrived, unsworn written statement of questionable motivation by one who chose to take her own life." Plaintiffs, on the other hand, contend the language of the suicide note reveals that the note meets the requirements of Article 804(B)(2), which does not prohibit a suicide note from being admitted into evidence as a statement under belief of impending death. Our consideration of these contentions includes an evaluation of the history of the dying declaration.
Hearsay is "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801(C). The basic principles for excluding hearsay testimony are: (1) the statement is made without the declarant being sworn to tell the truth; (2) there is no responsibility on the part of the declarant for falsification; (3) there is no opportunity for the court or jury to determine the demeanor or temperament of the witness; and (4) there is no opportunity for cross-examination. Donnelly v. United States, 228 U.S. 243, 273, 33 S.Ct. 449, 459, 57 L.Ed. 820 (1913). Although this is a civil suit for wrongful death as opposed to a criminal prosecution, the importance of cross-examination cannot be minimized.[12] Creation of an exception to the hearsay rule has two requisites: necessity and circumstantial probability of trustworthiness. McNamara, 22 La. L.Rev. at 651.
*91 Historically, there was a judicial reluctance to admit dying declarations. "If the circumstance that the eye witnesses of any fact be dead should justify the introduction of testimony to establish that fact from hearsay, no man could feel safe in any property, a claim to which might be supported by proof so easily obtained." Queen v. Hepburn, 11 U.S. 290, 296, 7 Cranch 290, 3 L.Ed. 348 (1813). Nevertheless, dying declarations were admitted as an exception to hearsay rules simply because of the necessities of the caseto prevent a manifest failure of justice that would result if a murderer were allowed to escape justice by causing the unavailability of the only witness to the murder. Mattox v. United States, 156 U.S. 237, 243-244, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895); see also, Carver v. United States, 164 U.S. 694, 697, 17 S.Ct. 228, 230, 41 L.Ed. 602 (1897); Blair v. Rogers, 185 Okla. 63, 89 P.2d 928, 930 (1939).
The rule of law that generally excludes hearsay evidence, along with the exception to the rule for a dying declaration, is of long standing, the rule and the exception having been passed on from the common law of England to the United States. The basis for the exception for dying declarations was explained more than two centuries ago:
[T]he general principle on which this species of evidence is admitted is, that they are declarations made in extremity, when the party is at the point of death, and when every hope of this world is gone: when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations[13] to speak the truth; a situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a Court of Justice.
R. v. Woodcock, (1789) 168 Eng.Rep. 352, 353 (K.B.).
In previous centuries, religious reasons were credited with fostering a fear of impending death that was assumed to be as powerful an incentive for telling the truth as the obligation of an oath. Thus, prior to the 20th century, courts in the United States required that dying declarations be received only when the court was satisfied that the declarant was fully aware of the fact that his recovery was impossible. Carver, 164 U.S. at 695, 17 S.Ct. at 229.
Early on, the party offering dying declarations in evidence had to show that the declarations were made under a sense of impending death. Mattox v. United *92 States, 146 U.S. 140, 151, 13 S.Ct. 50, 53-54, 36 L.Ed. 917 (1892). Admission of a decedent's testimony was justified on two grounds: necessity and the consideration that the "certain expectation of almost immediate death will remove all temptation to falsehood and enforce as strict adherence to the truth." Id. at 152, 13 S.Ct. 50; see also, McNamara, 22 La.L.Rev. at 654, who calls this consideration "circumstantial probability of trustworthiness." "The `classic' dying declaration is made by a person near death from fatal wounds or illness, who makes a statement to a third party about who inflicted the wounds or caused the illness. The third party testifies as to the declarant's condition and the circumstances of the statement." United States v. Angleton, 269 F.Supp.2d 878, 885 (S.D.TX.6/10/03). However, when the declaration is contained in a writing discovered after a suicide, no one can testify as to the making of the declaration. Certainty as to the time of the statement or whether it was written in the belief that death was imminent is lacking. Id. Additionally, dying declarations given with a view toward civil proceedings might be influenced by concern for the welfare of the declarant's family, whereas such a motive would not ordinarily be as influential in a typical homicide situation. Marler v. Texas Pac. Ry. Co., 52 La.Ann. 727, 27 So. 176 (1900), cited in McNamara, 22 La.L.Rev. at 652 n. 10.
Even in more secularized times, admissibility of a dying declaration depends upon the physical circumstances in which the dying declaration was made and whether the statement was made under the sense of impending or imminent death.
The exception at issue, commonly called the "dying declaration exception,"[14] is provided in La. C.E. art. 804(B):
(2) Statement under belief of impending death. A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.
The provision requires that the person seeking to have the declarant's statement introduced into evidence satisfy the court of two factors, sometimes referred to as the timing requirement and the content requirement[15]: 1) that the declarant believed his death was imminent/impending[16]; and 2) that the declarant's statement concerned the cause or circumstances of the impending death. A *93 declaration, whether oral or written, that fails to meet either the timing or the content requirement of a dying declaration is inadmissible. Angleton, 269 F.Supp.2d at 886.
A court's decision regarding the first factor, timing, rests on an evaluation of the declarant's subjective experience, i.e., what the declarant believed and not necessarily what others knew about his medical condition. In contrast, a court's decision regarding the second factor, content, rests on an evaluation of the objective facts related in the statement concerning the empirical cause and circumstances of the declarant's death. The declarant's subjective belief in the impending nature of his death is what is considered to assure the truth of his statement of the objective facts about the person, motive, or mechanism which made up the "cause or circumstances" of the impending death. "The pivotal question should be the declarant's belief as to his physical condition, not what it actually was." McNamara, 22 La.L.Rev. at 655. "The actual physical condition of the declarant at the time the statement was made is material and relevant insofar as it casts light on the state of mind of the declarant. . . . [T]he wider the disparity between the declarant's apparent belief of his approaching doom and his actual physical condition, the less probable it is that he actually believed the end was near." Id., citing State v. Augustus, 129 La. 617, 56 So. 551 (1911) (Declarant's belief in the reality of his impending death was a "mere mental operation"; his statement"I have been shot to death by Isidore for nothing"was a recitation of observable facts concerning the person (Isidore), motive (nothing), and mechanism (shooting) of his impending death.)
Our research has not shown a departure from this court's holding in Augustus that belief in impending death be corroborated by evidence of empirical circumstances, such as a serious wound or illness, at the time the declaration was made.[17] Code of Evidence provisions are consistent with this court's pronouncements in Augustus. "The amount of time that elapses between the injury and the victim's statement and the victim's circumstances during that interval are important factors in determining whether a court may infer that a witness made the statement under the belief of impending death."[18] HANDBOOK 2006, 2006 Authors' Notes (6) at 612. Explicit in this statement is that the injury precedes the declaration and not vice versa, as is the case *94 where a suicide note is penned some time prior to a hanging. In the instant case, there was no "amount of time" between the injury and the declaration during which Courtney's "circumstances" could significantly produce a sufficient motive to tell the truth, because the declaration preceded the fatal injury, hanging.
Historically in Louisiana, a theological belief in a future state of rewards and punishment was not a prerequisite to the admissibility of a dying declaration. Also, secular motives such as hatred or revenge on the part of the declarant did not prevent admission of the dying declaration. McNamara, 22 La.L.Rev. at 662. The rule for admitting a dying declaration was and is intended to allow a declaration by a person who is faced with an unexpected, mortal injury and cast by circumstances into a premature realization of certain death. The rule is in conflict when the declarant takes her own life. When the wrongful death sued upon is inflicted by the declarant herself, her statement that death is imminent is merely self-serving and lacking in any recognized motivation to tell the truth. Citing Augustus, supra, this court has established a test for determining whether a declarant's statement was made with a sense of impending death: "[T]he more serious the injury and impairment of the declarant's physical condition, the more probable is his belief that the end is near." State v. Verrett, 419 So.2d 455, 457 (La.1982).
The very nature of death by hanging prevents the application of this test in determining the admissibility of a suicide note, as there is no physical injury or impairment at the time the declaration is made. Thus, a caveat from over a century ago is particularly pertinent: a dying declaration "must be received with the utmost caution, and if the circumstances do not satisfactorily disclose that the awful and solemn situation in which [declarant] is placed is realized" by the declarant, the evidence ought to be rejected. Mattox, 146 U.S. at 152, 13 S.Ct. at 54.[19]
Although a declarant is seriously ill for a time prior to her eventual death, not all communications made while ill or depressed are admissible under the dying declaration exception. See Shepard v. United States, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933). The mere fact that death follows a statement does not render it admissible. Death must be imminent when the statement is made.[20] When, as in the instant case, the deadly trauma (hanging) was inflicted subsequent to the declaration, the mortality of an injury could not have been understood or realized by the decedent. The realization of immediate death must be present when the *95 statement is made. The likelihood of death, the awareness of eventual death, or the intention to eventually inflict death on one's self is not enough to place the declarant in the elevated sense of solemnity envisioned by the jurisprudence or the relevant codal provision. In Shepard, 290 U.S. at 99, 54 S.Ct. at 23, Justice Cardozo specified an "indispensable condition" of admission of a dying declaration was that "the declarant must have spoken without hope of recovery and in the shadow of impending death." The court noted that nothing in the condition of the declarant on the date of the statement gave "fair support to the conclusion that hope had then been lost. She may have thought she was going to die and have said so to her nurse, but this was consistent with hope, which could not have been put aside without more to quench it." Id., 290 U.S. at 99, 54 S.Ct. at 24.
Fear or even belief that illness will end in death will not avail of itself to make a dying declaration. There must be a settled hopeless expectation that death is near at hand, and what is said must have been spoken in the hush of its impending presence . . . What is decisive is the state of mind . . . [which] must be exhibited in the evidence, and not left to conjecture. The [declarant] must have spoken with the consciousness of a swift and certain doom. [Citations and internal quotation marks omitted.]
Shepard, 290 U.S. at 100, 54 S.Ct. at 24.
The control a declarant has over her fate distinguishes a suicide note from the true dying declaration, which the courts have elevated to the level of sworn testimony in the eyes of the law. Because a suicide note is a planned statement made in anticipation of a controlled act, it is not analogous to a dying declaration made under the belief of impending death by a person with a total lack of control over the timing and causation of death. See dissent in State v. Satterfield, 193 W.Va. 503, 457 S.E.2d 440, 455-456 (1995). A person intent on committing suicide retains the ability to draft a statement to her liking, defeating the assumed truthfulness the law attributes to true dying declarations when all cause for untruthfulness is presumed to have been eliminated by impending death. The motivation of one penning a suicide note differs from the motivation of someone unexpectedly facing imminent death. "The writer of a suicide note might have a motive to implicate another other than the truth. . . . A declarant who has decided to commit suicide would have no fear, perhaps other than religious convictions . . . of punishment for . . . the falsity of the note." State v. Hodge, 655 S.W.2d 738, 743 (Mo.App.1983).
The desire for revenge or self-exoneration may continue until the moment of death. 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE, § 804.05[1] at 804-49 (Joseph M. McLaughlin ed., 2d 2006). In her suicide note, Courtney stated she had not told her parents about the events recounted in the note for fear they would blame her. Thus, her accusations of others contained in the note are tainted with possible motives of self-exoneration. See Angleton, 269 F.Supp.2d at 883. The suggestion has been made that the dying declaration exception should not apply to suicide notes because of delusional feelings of appeasement related to suicide and characteristic feelings of aggression and guilt associated with the act. Note, The Judicial Interpretation of Suicide, 105 U.Pa.L.Rev. 391, 405-406 (1957). When the declaration precedes the mortal wound, the decedent's motivation is at best questionable, a condition that robs the statement of the reliability derived from belief in an impending death. Further, the aspect of control involved in an intended death lessens the *96 spontaneity that is important in a dying declaration exception. Angleton, 269 F.Supp.2d at 885; see also, Garza, 04-1484 at 1, 916 So.2d at 190 (McDonald, J., dissenting).
Our research of jurisprudence nationwide has revealed only one reported case, Satterfield, 193 W.Va. 503, 457 S.E.2d 440, that allowed admission of a suicide note as a dying declaration exception to the hearsay rule, and the majority opinion drew a vigorous dissent.[21] Further, the facts and circumstances of Satterfield make it substantially distinguishable from this case.
In Satterfield, the court admitted a suicide note under West Virginia's dying declaration rule that mirrored the federal rule. The author of the note had been a witness in a murder trial who was "aggressively questioned" at trial in a way that implied his participation in the murder. Prior to the reopening of court the following day, the witness committed suicide. He left a note proclaiming his innocence and stating that he could not take the pressure of going through a trial. The court found the double requirements of the dying declaration exception were satisfied: the decedent wrote the note believing his death was imminent because the suicide occurred soon after the note was written, and the note explained the suicide.
Although the majority opinion in Satterfield discussed the dying declaration exception to the hearsay rule, the purpose for which the suicide note was admitted in that homicide case was not to prove the fact of the homicide or who committed the homicide, but to respond to the defendant's allegations implicating the declarant as the person who had actually committed the homicide. The Satterfield suicide note itself differs significantly from Courtney's letter, because the Satterfield note did not point a finger at anyone; it merely attempted to exonerate the declarant, who was not on trial. Further, the note was not used as proof of the facts contained therein, but as a response to the questioning in court of the declarant.
The final distinction, that the declarant had already been subjected to cross-examination under oath in court in the same case in which the note was admitted into evidence, is the most significant. That opportunityto cross examine the witness and to have the witness available for the jury's scrutinywould not be available if Courtney's note is admitted into evidence in the instant case.
All of the cases that discuss the dying declaration exception require evidence of the declarant's perception of imminent death at the time the statement was made. The declarant's belief in impending death may be inferred from the types of wounds inflicted and the nature of the decedent's injuries. Mattox, 146 U.S. at 152, 13 S.Ct. at 54. Statements such as this imply that the mortal wound must precede the declaration and not vice versa, when a suicide note is written prior to the act of hanging one's self.
The vigorous dissent in Satterfield stated some poignant concerns. The declarant was in complete control of the timing and circumstances of his death. Thus, there is a significant difference between a suicide note and a statement made by a person facing inevitable death due to circumstances beyond his control. The dissent *97 stated a suicide note is a "perfect opportunity to rewrite one's own history in a way calculated to impress one's final audience." Satterfield, 193 W.Va. at 519, 457 S.E.2d at 456.
In the instant case, Judge McDonald's analysis is consistent with the dissent in Satterfield and consistent with Louisiana jurisprudence that has considered the admissibility of hearsay because a statement qualifies as a dying declaration. In comparison to the instant case, the facts and circumstances of Satterfield are so substantially different that the case cannot be considered as support for the decisions of the lower courts in this matter.
In summation, we find that the suicide note does not meet the qualifications of a statement under belief of impending death pursuant to La. C.E. art. 804(B)(2). The article provides that the statement be made at a time when the declarant was "believing that [her] death was imminent"; that is, believing in an "impending death." The use of the words "imminent" and "impending" militate against allowing the use of a suicide note which was written before the mortal wound was inflicted. "Impending" and "imminent" are words which require that a mortal wound or injury be inflicted at the time of the statement. The very act of writing the note militates against spontaneity. Courts have consistently assessed the physical condition of the declarant at the time the declaration was made, and the declarant's belief that she will not survive the injury. The decisions previously cited almost uniformly involved the factual situation in which the mortal injury had been inflicted prior to the statement.
After reviewing the words of the statute in light of the long line of jurisprudence addressing the dying declaration, we conclude it is the declarant's actual physical condition which must be evaluated to determine if it was possible for her to believe death was imminent. In this matter, at the time the note was written, the declarant was not dying; the mortal wound had not been inflicted. As such, death was not imminent or impending as those words are used in the article. Absent a mortal wound at the time of the statement, the statement lacked the "circumstantial probability of trustworthiness" required for admission as a dying declaration. McNamara, 22 La.L.Rev. at 654.
Additionally, it is undisputed that Courtney's death occurred some months after the alleged rape. The temporal element of her declaration relates to a determination of whether Courtney penned the letter at a time when she believed death was imminent/impending. Traditionally, a dying declaration was limited to the facts and circumstances constituting the res gestae of the decedent's fatal injury. Lucas v. Commonweath, 153 Ky. 424, 155 S.W. 721, 722-723 (1913); see also, discussion of this requirement at 2 McCORMICK ON EVIDENCE § 311 at 330 (John W. Strong ed., 4th ed. 1992) ("[D]eclarations [were] admissible only insofar as they relate[d] to the circumstances of the killing and to the events more or less nearly preceding it in time and leading up to it.").
Having found that the plaintiffs failed to carry their burden of proving the timing requirement of the statute, it is unnecessary for us to address whether they proved the content requirement. See text at footnote 14. However, we do note that the wording of La. C.E. art. 804(B)(2) that restricts the content of the dying declaration to the "cause or circumstances" of the impending death has been evaluated as "generally sound because the connection between these circumstances and the statement helps to enhance its trustworthiness by reducing the dangers of poor memory and insincerity." 2 McCORMICK *98 ON EVIDENCE § 315 at 334. A declaration that does not meet one of the two requirements of the exception for a statement under belief of impending death is inadmissible pursuant to the hearsay rule. Angleton, 269 F.Supp.2d at 886.
The suicide note in the instant case is hearsay. Admitting it into evidence would result in a statement made by someone who was not sworn to tell the truth, who faced no responsibility for falsification, who could not be observed by the fact finder, and who was not subject to cross-examination. See Donnelly, 228 U.S. at 273, 33 S.Ct. at 459.
In our analysis of Article 804(B)(2), we have interpreted the language used by the legislature while keeping in mind the admonishment of the legislature barring judicial creation of exceptions to the hearsay rule. See La. C.E. art. 802. Thus, we hold the lower courts erred in classifying the suicide note in this case as a dying declaration.
Then existing mental, emotional, or physical condition:
The statutory provision involved with plaintiffs' alternative argument is La. C.E. art. 803(3), which states:
Art. 803. Hearsay exceptions; availability of declarant immaterial
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . . .
(3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant's then existing condition or his future action. A statement of memory or belief, however, is not admissible to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's testament.
The exception for then existing mental, emotional of physical condition, like the dying declaration exception, is of long standing. The United States Supreme Court consideredand rejected as inapplicable under the facts of that caseboth exceptions in Shepard, supra.
The Official Comments to this exception point out that it clarifies prior Louisiana law and generally follows the federal rules. However, the legislature borrowed from the approach taken in Alaska by adding the phrase "offered to prove the declarant's then existing condition or his future action." This insertion establishes the limited scope of the exception as stated by this court in State v. Weedon, 342 So.2d 642, 646 (La.1977) (An out-of-court declaration by one person is inadmissible to show what another person did.) Considered in the context of the instant case, the suicide note might be admissible to prove Courtney's state of mind, for example, depressed or despondent or suicidal, at the time of the statement and to prove Courtney's future action of taking her own life, but it is not admissible to prove the actions of Paul Upshaw, other fraternity members, the fraternity itself, and/or SLU.
If the prohibition of the first sentence of the statute for use of the declaration to prove another's action were not sufficient, the legislature sealed the inquiry by its next statement that: "[a] statement of memory or belief . . . is not admissible to prove the fact remembered or believed." Courtney's statements in her suicide note not only concerned the defendants' alleged acts, but, in plaintiffs' words, "the connection between her state of mind immediately prior to her death, and what *99 she believed to be the causes of her death."[22] The limitation of La. C.E. art. 803(3) could not be clearer: the fact remembered or believed by the declarant cannot be proved by the out-of-court statement, even if the statement otherwise relates to the declarant's then existing mental or emotional condition or to her future action.
The limitation of the exception was eloquently explained in Shepard, 290 U.S. at 105-106, 54 S.Ct. at 26:
Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored. The testimony now questioned faced backward and not forward. This at least it did in its most obvious implications. What is even more important, it spoke to a past act, and, more than that, to an act by some one not the speaker. Other tendency, if it had any, was a filament too fine to be disentangled by a jury.[23]
As we explained previously, the suicide note consisted of three parts, with the final part already excluded by the trial court. Thus, we consider the plaintiffs' argument for admission as referring only to the first two parts of the note.
In the first part of the note, Courtney states she had been thinking about suicide for months, having been constantly depressed. This part, although dealing with state of mind, does not deal directly with her present state of mind. The statement may provide background for her present state of mind, but it is clearly not admissible under this exception since the references were to depression in the past. Further, her state of mind in the past as stated in this first part would not be relevant to the issue in the case, i.e., whether the defendants' acts led her to commit suicide, because she made no accusations against any individuals or entities in this part of the note; she merely described her depression and uncertainty about the suicide.
The second (middle) part of the suicide note is the portion that includes accusations against various members of the fraternity, especially Upshaw. As previously stated, this portion cannot be admitted pursuant to this particular exception to the hearsay rule because Article 803(3) codified the Louisiana rule that a statement of present state of mind cannot be used to prove the acts of a third party. La. C.E. art. 803(3), Official Comments, citing Weedon, 342 So.2d 642.
Although plaintiffs' alternative argument was not ruled on by the lower courts, because of their determination that the suicide note was a dying declaration, we hold that, as a matter of law, this particular suicide note cannot be admitted pursuant to La. C.E. art. 803(3). The note does not fall under this exception to the hearsay rule for three reasons: 1) for the most part, the declarant does not speak of present state of mind, but speaks of past *100 state of mind;[24] 2) the declarant accuses others of wrongdoing, which accusations exceed the statutory limit that the declaration be offered to prove the declarant's future action;[25] and 3) the declarant relates memories and beliefs which are not admissible to prove the facts remembered or believed.

DECREE
Because the portions of the suicide note presently in question do not qualify as an exception to the hearsay rule pursuant to La. C.E. art. 804(B)(2) or art. 803(3), the suicide note is inadmissible hearsay, requiring the reversal of the lower courts' rulings.
JUDGMENT REVERSED; MATTER REMANDED.
JOHNSON, J., dissents and assigns reasons.
TRAYLOR, J., dissents and assigns reasons.
KIMBALL, J., dissents for reasons assigned by TRAYLOR, J.
JOHNSON, J., dissenting.
I respectfully dissent.
This matter addresses the admissibility of a suicide note as an exception to the hearsay rule pursuant to the provision regarding "dying declarations." LACODE Ewa art. 804(B)(2) provides:
Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: Statement under belief of impending death. A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.
(Emphasis added).
As the majority articulated, the "dying declaration" exception to the hearsay rule has developed through the centuries, from its origin which is rooted in the common law of England, and now, this exception provides for the admission of evidence in civil proceedings. Although many older cases discuss the applicability of the "dying declaration" exception in the context of a criminal proceeding, these discussions are still relevant to the civil proceeding at hand. In Mattox v. U.S., 14611U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), the United States Supreme Court found:
Dying declarations are admissible on a trial for murder, as to the fact of the homicide and the person by whom it was committed, in favor of the defendant as well as against him. 1 East, P.C. 353; Rex. v. Scaife, 1 Moody & R. 551; U.S. v. Taylor, 4 Cranch, C.C. 338 [(1833)]; Moore v. State, 12 Ala. 764 [(1848)]; Corn. v. Matthews, 89 Ky. 287, 12 S.W. Rep. 333 [(1889)]. But it must be shown by the party offering them in evidence that they were made under a *101 sense of impending death. This may be made to appear from what the injured person said; or from the nature and extent of the wounds inflicted being obviously such that he must have felt or known that he could not survive; as well as from his conduct at the time and the communications, if any, made to him by his medical advisers, if assented to or understandingly acquiesced in by him. The length of time elapsing between the making of the declaration and the death is one of the elements to be considered, although, as stated by Mr. Greenleaf, `it is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible.' 1 Greenl. Ev. (15th Ed.) §§ 156, 157, 158; State v. Wensell, 98 Mo. 137, 11 S.W. Rep. 614 [(1889)]; Com. v. Haney, 127 Mass. 455 [(1879)]; Kehoe v. Com., 85 Pa. St. 127[(1878)]; Swisher v. Com., 67 Va. 963, 26 Grat. 963 [(1875)]; State v. Schmidt, 73 Iowa, 469, 35 N.W. Rep. 590 [(1887)].[1]
On April 8, 2001, Courtney Garza wrote a three-page suicide note, in which she expressed her inability to cope with the fact that a fellow student (at Southeastern University in Hammond) raped her on February 6, 2001. In her note, Courtney explained her desire to end her life and suggested that this note was "goodbye." On April 9, 2001, Courtney Garza hanged herself at her parents' home in Baton Rouge. From these facts, one could surmise that Courtney's rapeand the ensuing psychological repercussions "cause[d] . . . what [Courtney] believed to be [her] impending death."[2] As the appellate court aptly noted:
Courtney's written words expressly indicate an awareness of her impending death. She writes, "I thought I would've cut it short sometime before nowiiii I'm still scared right now as I plan it out, but I'm really doing it this time." Her closing words are, "This is goodbye." The contents of Courtney's note reflect a settled expectation-a realization-that death was at hand. See Shepard v. United States, 290 U.S. 96, 100, 54 S.Ct. 22, 24, 78 L.Ed. 196 (1933).
. . . .
To qualify as a dying declaration, the statement also must relate to the cause or circumstances of the declarant's death. LSA-C.E. art. 804 B(2). The handwritten note offers insight into the circumstances leading to the suicide that shortly followed. Courtney wrote, "I guess I'll begin [and] explain what happened to me this semesteriiii I hope you can read this. It explains it all for you." Courtney recounts past events, explaining the causes and circumstances she perceived to have brought her to suicide. See Angleton, 269 F.Supp.2d at 888.[3]
Courtney Garza's rape was the type of "[wound] inflicted . . . such that [Courtney] must have felt or known that [she] could not survive."[4]
Accordingly, for the above reasons, I respectfully dissent. I would affirm the appellate court's decision.
*102 TRAYLOR, Justice, dissenting.
I respectfully dissent.
While I do not dispute the historical underpinnings of the dying declaration exception to the hearsay rule, I do not find that discussion relevant to the admissibility of a statement made under the belief of impending death in the civil suit presented here. Prior to Louisiana's adoption of a Code of Evidence, and the present language found in the hearsay exception found in La.Code Evid. art. 804(B)(2), Louisiana adhered to the common law requirement "that for a declaration to qualify under this exception the declarant must in fact have died and his death must be the subject of the prosecution in which the declaration is used." La.Code Evid. art. 804(B)(2), Comments to Exception (B)(2)-1988, (c). Thus, prior to adoption of the evidence code, the applicability of the former hearsay exception was restricted to criminal cases and, practically speaking, to a finite factual scenario wherein the statement of a victim was offered in a prosecution for criminal homicide.
The majority opinion's reliance on cases both federal and state, decided under this restrictive application of the former version of the hearsay exception at issue, is not helpful to the resolution of the issue before the court.[1] Louisiana, like other jurisdictions, has broadened the common law rule to include declarants who are not murder victims.
La.Code Evid. art. 804(B)(2) provides as follows:
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
(2) Statement under belief of impending death. A statement made by a declarant while believing that his death was imminent, concerning the cause or circumstances of what he believed to be his impending death.
This exception to the hearsay rule imposes two requirements-a temporal one and one of content. I would find, as in the case of State v. Satterfield, 193 W.Va. 503, 457 S.E.2d 440 (1995), that the temporal and content requirements of the dying declaration exception to the general inadmissibility of hearsay are met in this case.
The Satterfield court found that the suicide note at issue there satisfied both the temporal and content requirements of the dying declaration exception. There was evidence that the decedent wrote the suicide note with the belief that he was facing imminent death because he killed himself soon after writing the note. In addition, the suicide note explained the causes or circumstances which led to his death, i.e. that although he was not guilty of the crime, he could not face the pressure of the trial. Moreover, the Satterfield court found that the suicide note was both relevant to the issue before the court, i.e. who was responsible for the victim's murder, and that the probative value of the note was not substantially outweighed by unfair prejudice.
Although the majority attempts to distinguish this case by stating that the purpose for which the suicide note was admitted in Satterfield was not to prove who committed the homicide, that is exactly the reason why the suicide note was relevant. The fact that Moore exonerated himself in the note served as further evidence under the facts of that case that the possible list of culpable persons had been diminished by one. Moore's suicide note *103 served to convey the message that he was not guilty of the murder.
Although the majority notes as a significant distinction that the Satterfield jury had the opportunity to view Moore's cross-examination, while the jury in this case will not be able to view Courtney Garza, this is a consideration not focused upon by the Satterfield court in determining the admissibility of the suicide note. Nor was our legislature deterred by this consideration. There are several hearsay exceptions which allow the admissibility of hearsay when the declarant is unavailable. La. Code Evid. Art. 804(B)(1-6).
In support of its determination that a suicide note is not a dying declaration, the majority relies on several cases from other jurisdictions. See Opinion, page 96, note 21. A further review of these cases shows that they fail to lend support to the majority determination in this matter. In each case, either the suicide note at issue did not satisfy the temporal and content requirement to be considered a dying declaration, or the suicide note was found inadmissible because the case was decided under the former restriction of this hearsay exception to criminal homicide cases.
In United States v. Lemonakis, 485 F.2d 941 (D.C.Cir.1973), cert. denied, 415 U.S. 989, 94 S.Ct. 1586, 1587, 39 L.Ed.2d 885 (1974), the federal appellate court found the suicide note at issue was not admissible because it did not fulfill the temporal and content requirements of a dying declaration. The timing and content of the note disqualified it as a dying declaration exception to the hearsay rule. Lemonakis, 485 F.2d at 956. Even so, the federal court found the failure to admit the note was error, but harmless in the context of the other facts and circumstances of that case. Id., 485 F.2d at 957-961.
Similarly, in United States v. Angleton, 269 F.Supp.2d 878 (S.C.Tex.2003), the federal district court found that the five jail notes found with the decedent did not qualify as dying declarations because they did not fulfill the requirements of that exception. Three of the five notes were undated; two were dated weeks prior to the suicide. None of the notes satisfied the temporal requirement of a dying declaration. Moreover, the contents of the notes showed that they did not address the cause or circumstances of the decedent's death, for in addition to confessing to murder, they sought to exculpate the decedent's brother. Of interest to the case presently before us, Angleton noted that "a statement about past events, rather than about the cause or circumstances of death, is not a dying declaration, unless those events explain the predicament that brought the declarant to death's door." Angleton, 269 F.Supp.2d at 888.
In Commonwealth v. Antonini, 165 Pa.Super. 501, 69 A.2d 436 (1949), a suicide note was written which implicated the decedent and the defendant in a tax fraud and embezzlement scheme. The reason the suicide note was not recognized as a dying declaration was the fact that the Pennsylvania court at that time only recognized the hearsay exception at issue in homicide cases. In fact, the Pennsylvania court stated "[the suicide note] was not admissible as a dying declaration, for, whether logically or not, dying declarations are received in evidence only when made by the victim of a homicide for which the defendant is on trial." Antonini, 69 A.2d at 438.
In Vining v. American Bakeries Co., 121 Fla. 122, 163 So. 519 (1935), the defendants sought a new trial in a case where the plaintiff had been successful in securing a damage award for injuries. The defendants alleged that two witnesses testified falsely at the trial of the plaintiff's case and were so induced to testify by the *104 plaintiff's father. Criminal charges were filed and pending against the two witnesses. Shortly after the perjury charges were suggested, the plaintiff's father committed suicide, leaving a note proclaiming his innocence. The Florida court held that the suicide note was not a dying declaration "as would be legally admissible as evidence in plaintiff's behalf" with regard to the request for new trial. Id., 163 So. at 520. The cause of the inadmissibility is not explained further. However, reference to Florida evidence law shows that, at the time this case was decided, Florida law allowed the admission of a dying declaration only in homicide prosecutions. Fla. Stat. § 90.804"Law Revision Council Note-1976," Subsection (2)(b) ("Existing Florida law allows the admission of a dying declaration only in prosecution for the death of the declarant. Johnson v. State, 63 Fla. 16, 58 So. 540 (1912)."). Thus, once again, the reason the suicide note was not found admissible had to do with the traditional restriction for the hearsay exception.
Finally, in Hammers v. Knight, 168 Ill. App. 203 (Ill.App. 2 Dist.1912), a minor child brought an action against saloon keepers for loss of support caused by the suicide of his father who obtained intoxicating liquor from the saloon keepers. The Illinois court found the suicide note was inadmissible as a dying declaration where it was not shown to be part of the res gestae. There was no proof that the note was written at the time the decedent shot himself; nor did the note relate the cause or circumstances of his death. The court was unable to determine whether the decedent's note, which implied his wife's infidelity, was a statement of truth which might explain the cause of the decedent's suicide, or whether the statement was made as a result of the decedent's intoxication. Thus, the note did not satisfy the temporal or content requirement of a dying declaration.
The Louisiana cases cited by the majority, based as they were on the prior restrictions to the admissibility of this hearsay exception, do not aid in our determination of the issue, either. Marler v. Texas Pac. Ry. Co., 52 La. Ann. 727, 27 So. 176 (1900) was a civil case, which actually concerned applicability of a res gestae exception to the hearsay rule rather than the common law dying declaration exception. Any reference in that case to the dying declaration exception was admitted by the court to have "no reference whatever to the facts of this particular case." Marler, 52 La. Ann. at 742, 27 So. at 182.
In State v. Augustus, 129 La. 617, 56 So. 551 (1911), the court found the proper foundation had been laid for the admission of a statement by the decedent in a traditional dying declaration scenario, i.e. where the victim voiced who had shot him to third parties and died soon thereafter. Id., 129 La. at 620, 56 So. at 552. Similarly, the court found a proper foundation for a traditional dying declaration scenario in a statement made by the decedent in State v. Verrett, 419 So.2d 455, 457 (La.1982).
The requirements of the infliction of mortal injury prior to making the statement, which the majority extracts from these and other cases cited, is tied to the criminal nature of the homicide cases at issue and the former restriction on the applicability of the hearsay exception to murder victims. Such a requirement was not imposed by the legislature when this hearsay exception was included in the Code of Evidence and cannot be engrafted by judicial fiat.
While courts are prohibited from broadening the application of hearsay exceptions, as cautioned in the majority opinion, I feel that we cannot narrow them, either. The legislature has extended application of this hearsay exception to civil cases, and *105 our job as a court is to interpret the evidence article as written.
I find that the suicide note of Courtney Garza fits within the commonly accepted meaning of the language of La.Code Evid. art. 804(B)(2). Courtney is deceased; thus, she is unavailable as a witness under the evidence code. Her statement, dated one day prior to the discovery of her body found dead by suicide, was surely written at a time when Courtney believed that her death by hanging was imminent. The contents of the note, as redacted by the trial court, concerns the cause and circumstances of Courtney's death, as she believed them to be. Thus, the temporal and content requirements of a statement made under the belief of impending death are met.
Moreover, I agree with the court of appeal that this suicide note is relevant to the case under La.Code Evid. art. 401, and that the probative value of the evidence outweighs the danger of unfair prejudice. La.Code Evid. art. 403. As to the majority's concerns regarding Courtney's possible motives in writing the suicide note, such as revenge, self-exoneration, or the desire to "rewrite one's own history," I find that those considerations are susceptible to proof which may be admitted at trial and argued to the jury.
Because I find that the trial court and court of appeal correctly decided this issue, I respectfully dissent.
NOTES
[1] Although the caption of plaintiffs' petition names ABC Insurance Company as a defendant, the petition lists XYZ Insurance Company as a named defendant.
[2] Garza v. Delta Tau Delta Fraternity National, 05-1508, 05-1527 (La.1/9/06), 918 So.2d 1019.
[3] However, considering the procedural posture of this case, specifically that the matter is before us on motions in limine, we note that a redacted version of the suicide note could be admissible in light of our discussion herein, and depending upon future developments in the case. See footnote 24, infra.
[4] By supplemental and amending petition filed February 6, 2002, Courtney's parents assert a claim pursuant to LSA-C.C. art. 2315.1 to recover damages for the pain and suffering of Courtney prior to her death, i.e. a survival action.
[5] The petition also included allegations against SLU for negligence in providing inadequate and unsupervised "counseling" when, subsequent to a February 6, 2001 incident, Courtney presented herself to the SLU Comprehensive Counseling Center in "acute emotional distress as an `emergency walk-in' "and was seen by an SLU practicum student counselor. While SLU's writ application was pending in this court, this portion of plaintiffs' claim against SLU was disposed of in a "Partial Judgment of Dismissal" dated September 29, 2005, by the district court based on a consent judgment between the plaintiffs and SLU. The judgment further dismisses the medical review panel for lack of evidence of a breach of the standard of care by the SLU Comprehensive Counseling Center.

Thus, the remainder of plaintiffs' claim against SLU relates solely to the university's alleged vicarious liability for the actions of the members of DTD Local.
Other defendants named in the petition are the "Hammond City Police Department" and Officer Edwin Bergeron. Those two defendants are not before this court. Plaintiffs also alleged liability coverage by XYZ insurance company.
[6] Article 403 of the Code of Evidence provides for a balancing test by granting the court discretion to exclude relevant evidence if its probative value is substantially outweighed by the danger of "unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."

The excluded portion of Courtney's note begins with "I'm sorry Mom" and ends with "This is goodbye." The plaintiffs did not seek a writ as to the portion of the district court's judgment granting the motion in limine. Thus, the portion of the suicide note after the word "debt" on page three is not before us.
[7] The published opinion denied the writ application of DTD Local and DTD National. In an unpublished ruling, 04-CW-1567 (La.App. 1 Cir. 5/6/05), 903 So.2d 20 (table), the writ application of SLU was also denied by a two-to-one vote.
[8] There is nothing in the record to establish the time of death or whether the 12:30 reference is to A.M. or P.M. As such, based on the record, it is impossible to determine the time frame between the writing of the note and death.
[9] As defendants have pointed out, the majority opinion infers that the portion of the note beginning with "I guess I'll begin" on page two of the note was the portion the appellate court found related to the cause of death.
[10] In contrast, the articles of the Louisiana Civil Code have a distinct historical pedigree.
[11] Although admissible hearsay has been increased, the "Introductory Note" explains that the following caveat is pertinent: "The exceptions [to the hearsay rule] are phrased in terms of nonapplication of the hearsay rule, rather than in positive terms of admissibility, in order to repel any implication that other possible grounds for exclusion are eliminated from consideration." Fed.R.Evid. 803, Advisory Committee's Note. Thus, although a hearsay statement may not be excludable because it falls within one of the exceptions to the hearsay rule, that statement may be excludable on other grounds, such as Article 403. HANDBOOK 2006 at 533. The trial court in the instant case utilized Article 403 to exclude the final portion of Courtney's suicide note.
[12] A criminal defendant's right to confront his accusers is guaranteed by the Confrontation Clause of the Sixth Amendment of the United States Constitution. The United States Supreme Court has recognized that forcing the witness to submit to cross-examination is the "greatest legal engine ever invented for the discovery of truth." California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970), quoting 5 JOHN HENRY WIGMORE, TREATISE ON THE ANGLO-AMERICAN SYSTEM OF EVIDENCE IN TRIALS AT COMMON LAW, INCLUDING THE STATUTES AND JUDICIAL DECISIONS OF ALL JURISDICTIONS OF THE UNITED STATES AND CANADA § 1367 (3d ed.1940).
[13] Eighteenth century rationale was that the impending judgment of God imposed an obligation of honesty upon the dying, so as to justify an exception to the exclusionary hearsay rule. Desmond Manderson, Et Lex Perpetua: Dying Declarations & Mozart's Requiem, 20 Cardozo L.Rev. 1621, 1629 (1999); see also, People v. Nieves, 67 N.Y.2d 125, 501 N.Y.S.2d 1, 492 N.E.2d 109, 113 (1986). See also, McNamara, 22 La.L.Rev. at 657 (1962), quoting 5 WIGMORE at § 1443:

[I]t remains to determine exactly why courts attribute trustworthiness to the declarations of a man who thinks his end is near. Professor Wigmore lists the three explanations most often advanced by courts:
"(1) The declarant, being at the point of death, `must lose the use of all deceit'in Shakespeare's phrase. There is no longer any temporal self-serving purpose to be furthered.
"(2) If a belief exists in a punishment soon to be inflicted by a Higher Power upon human ill-doing, the fear of this punishment will outweigh any possible motive for deception, and will even counterbalance the inclination to gratify a possible spirit of revenge.
"3) Even without such a belief, there is a natural and instinctive awe at the approach of an unknown futurea physical revulsion common to all men, irresistible, and independent of theological belief."
[14] Counsel for the plaintiffs correctly notes that although the exception is commonly referred to as a "dying declaration," the evidence code refers to the exception as a "statement under belief of impending death." Nevertheless, most treatises refer to the exception as a "dying declaration." The change in wording may have been prompted by the fact that the former requirement that the declarant shall have died before a dying declaration may be admitted into evidence has, for the most part, been eliminated.

Further, the wording "while believing that his death was imminent" is a lesser emphatic description of the declarant's mental state than the requirement of the common law cases of abandonment of all hope. 2 McCORMICK ON EVIDENCE § 310 at 326 n. 6 (John W. Strong ed., 4th ed.1992) citing Johnson v. State, 579 P.2d 20 (Alaska 1978) (In light of advancement in modern medicine, the former standard is too demanding; the new standard requiring awareness of impending death suffices to create solemnity and to remove the ordinary worldly motives for misstatement.)
[15] United States v. Angleton, 269 F.Supp.2d 878, 886 (S.D.TX.6/10/03).
[16] These two words, used interchangeably in the statute, are synonymous. ROGET'S INTERNATIONAL THESAURUS 151 (3rd ed.1969). "Imminent" is of late Middle English origin, from Latin-imminent"overhanging, impending"; also from the verb imminere, from in "upon, toward" and minere "to project." THE NEW OXFORD AMERICAN DICTIONARY 850 (2001).
[17] 

Did the deceased, at the time of making the statement, believe in the reality of his impending death? Such belief being a mere mental operation, its existence can be evidenced only by outward expression and surrounding circumstances. The declaration of the deceased that he was going to die, uncorroborated by the circumstances of the case, has rarely been held, of itself, a sufficient foundation for the admission of his statements as dying declarations; . . . when the wound is from its nature mortal, and when, as a matter of fact, the deceased shortly after making his statement died, the courts have uniformly held that the declarant really believed that death was impending. . . . [Emphasis supplied.]
Augustus, 129 La. at 619, 56 So. at 552.
In the instant case, plaintiffs aver Courtney's belief in impending death was corroborated by the fact that her death by hanging followed, at most, within a day of the writing of the note. This argument overlooks the fact that the timing of her death was totally within her control, a major factor that differs dramatically from corroboration by "circumstances of the case" found in Augustus.
[18] As an example, the authors cite State v. Winn, 97-2509 (La.App. 4 Cir. 1/14/98), 705 So.2d 1271 (Courts look not only to any actual words of the declarant as to this belief, but also to the circumstances surrounding the statement, to determine if the declarant actually believed her demise was imminent.).
[19] Defendants further suggest that one contemplating suicide may not be able to differentiate between truth and fiction. This suggestion is made more likely by the fact that Courtney indicated in the note she was ingesting an alcoholic beverage while writing the suicide note in question. However, these considerations would go to the weight to be accorded to the evidence rather than its admissibility as an exception to the hearsay rule.
[20] The lack of impending death at the time an alleged dying declaration was made resulted in a reversal of a conviction for murder in Shepard. The defendant was charged with murdering his wife by poison. The wife first collapsed on May 20, 1929, and rallied two days later at which time she told her nurse that her husband had poisoned her. A week after her statement, the victim relapsed and ultimately died on June 15, 1929. The lower courts allowed the wife's declaration to her nurse to be admitted into evidence at the husband's trial. The United States Supreme Court reversed the conviction on the ground that the facts and circumstances surrounding the wife's declaration did not support the conclusion that she made the statement while experiencing a sense of impending death.
[21] In contrast, there are several cases that did not recognize a suicide note as a dying declaration: United States v. Lemonakis, 485 F.2d 941, 957 n. 24 (D.C.Cir.1973); United States v. Angleton, 269 F.Supp.2d 878 (S.D.Tex, 6/10/03); Commonwealth v. Antonini, 165 Pa.Super. 501, 504, 69 A.2d 436, 438 (1949); Vining v. American Bakeries Co., 121 Fla. 122, 125, 163 So. 519, 520 (1935); Hammers v. Knight, 168 Ill.App. 203 (Ill.App. 2 Dist.1912).
[22] Further, in brief to this court urging the suicide note is admissible pursuant to the hearsay exception for then existing mental condition, the plaintiffs state that they "have consistently alleged and discovered that Ms. Garza committed suicide over the tortuous acts and conduct of the various defendants as well as the omissions to act in response to her allegations."
[23] The declaration at issue in Shepard was, once again, a wife's claim that her husband poisoned her, which could lead to jury confusion over admission of the declaration for the extremely limited purpose of proving present state of mind.
[24] There are some brief references in the note to Courtney's state of mind at the time she penned the note. However, at this point in the litigation, defendants concede that Courtney was depressed and suicidal at the time she penned the note. Thus, her present state of mind is not now at issue. If, at a later date in the proceedings, her present state of mind becomes a disputed issue, the trial court will be able to make an analysis of the contents of the note in light of our pronouncements to determine if a redacted version of the note may be admissible pursuant to La. C.E. art. 803(3) after applying the balancing test of La. C.E. art. 403.
[25] This limitation is based on the perceived unreliability of the use of the declarant's state of mind to establish the acts of another person. HANDBOOK 2006, 2006 Authors' Notes (6) at 567.
[1] Mattox v. U.S., 146 U.S. 140, 151, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) (emphasis added).
[2] LA.CODE EVID. art. 804(B)(2) (alteration in original) (emphasis added).
[3] Garza v. Delta Tau Fraternity Nat., 04-1484 (La.App. 1 Cir. 5/6/05); 916 So.2d 185, 188-189.
[4] Mattox v. U.S., 146 U.S. 140, 151, 13 S.Ct. 50, 54, 36 L.Ed. 917 (1892) (alteration in original) (emphasis added).
[1] Federal cases still restrict application of the hearsay exception in criminal cases to homicide; although the exception has been extended to apply to civil cases. See Fed. Rules Evid. Art. 804(b)(2) (2006 ed.).